## YVES HENRY LORTHE *v.* COMMISSIONER OF CORRECTION
## (AC 26354)

DiPentima, Lavine and Dupont, Js.

Argued March 20—officially released September 11, 2007

*Damon A. R. Kirschbaum*, special public defender, for the appellant (petitioner).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, was *David I. Cohen*, state's attorney, for the appellee (respondent).

*Opinion*

LAVINE, J. This is an appeal from the judgment of the habeas court, *J. Kaplan, J.*, sua sponte dismissing the petition for a writ of habeas corpus filed pro se by the petitioner, Yves Henry Lorthe. The petitioner claims that the court improperly granted the motion for leave to withdraw appearance (*Anders* motion)[1] filed by his special public defender and dismissed his petition for a writ of habeas corpus. We affirm the judgment of the habeas court.

On June 13, 2001, the trial court, *Kavanewsky, J.*, sentenced the petitioner to twenty-seven years in the custody of the respondent, the commissioner of correction, pursuant to the petitioner's guilty plea to murder in violation of General Statutes § 53a-54a. On December 3, 2001, the petitioner filed pro se a petition for a writ of habeas corpus. In his preliminary statement, the petitioner alleged that his conviction was illegal because (1) he was denied the right to confront witnesses against him and the right to compulsory process to obtain witnesses to testify in his favor, (2) he was sentenced on a guilty plea that failed to comply substantially with the rules of practice, (3) he was not advised of the

---

[1] The motion was filed pursuant to *Anders* v. *California*, 386 U.S. 738, 87 S. Ct. 1396, 18 L. Ed. 2d 493 (1967).

immigration consequences of his guilty plea in violation of General Statutes § 54-1j and the right to due process, and (4) all of the foregoing were a result of his having been denied the right to the effective assistance of counsel.

A special public defender, Kenneth Paul Fox, was appointed to represent the petitioner in the habeas court. Subsequently, Fox filed an *Anders* motion to withdraw his appearance because, after reviewing the matter, he had concluded that there was no credible basis to believe that the petitioner had received ineffective assistance of counsel and that his claims were frivolous and without merit. On April 21, 2004, after reviewing the petition for a writ of habeas corpus, the *Anders* motion and the petitioner's objection to it, the habeas court granted the *Anders* motion and sua sponte dismissed the petition for a writ of habeas corpus. In its memorandum of decision, the habeas court stated: "[T]he petitioner asserts ineffective assistance of counsel on the grounds that he was denied his right to confront adverse witnesses and was sentenced upon a guilty plea that did not comply with the relevant Practice Book provisions. . . . [T]he record indicates that the petitioner waived his rights to confront witnesses and that the guilty plea complied with §§ 39-19 and 39-20 of the Practice Book. A thorough review of the petitioner's file has failed to demonstrate that there are nonfrivolous claims of ineffective assistance of counsel [and] [t]he record indicates that the petitioner was informed by the court of possible immigration consequences. . . . The petitioner acknowledged during the court's canvass that he understood the possible consequences of his guilty plea on his immigration status." (Citation omitted.) The court concluded that there was "absolutely no merit to the petitioner's claims . . . ."

The habeas court subsequently granted the petitioner's application for a waiver of fees, costs and expenses

to appeal. The habeas court, however, did not appoint counsel for an appeal and denied the petition for certification to appeal. The petitioner pro se filed a timely appeal. On March 14, 2005, pursuant to its memorandum of decision in response to a request to reconsider filed by public defender Martin Zeldis, the court sua sponte vacated its order denying certification to appeal and granted certification to appeal.[2] On appeal, the petitioner asks this court to reverse the judgment of the habeas court and to remand the matter for a trial. We deny the relief requested and affirm the judgment of the habeas court.

## I

## SCOPE OF REVIEWABILITY

First we must determine, which, if any, of the issues on appeal are reviewable, a subject on which the parties disagree. The petitioner's brief includes an introduction to the argument, which states: "The habeas court erred by granting the petitioner's habeas counsel's motion for leave to withdraw appearance of appointed counsel and dismissing the petitioner's pro se petition for a writ of habeas corpus because the petitioner's habeas counsel failed to adequately articulate the claims raised by the

---

[2] On December 1, 2004, Martin Zeldis, head of the public defender legal services unit, filed an appearance in this appeal "limited to representation regarding the request to reconsider and motion for extension of time and subject to a determination regarding the propriety here of the appointment of the public defender as counsel." Subsequent to the habeas court's denying the motion to reconsider, Zeldis filed a preliminary statement of issues, pursuant to Practice Book § 63-4 (a) (1), stating that the petitioner intended to pursue the following claims on appeal: "(1) Whether the court erred in its failure to allow the petitioner to be heard on the motion to withdraw? (2) Whether the court erred in its dismissal of the petition for a writ of habeas corpus without affording the petitioner the ability to be heard on the question of dismissal? (3) Such other errors as are revealed upon a review of the transcript." The first two issues were not pursued in the petitioner's appellate brief.

Damon A. R. Kirschbaum, special public defender, entered his appearance in lieu of Zeldis on April 26, 2005.

petitioner and other potential claims, the petitioner's habeas counsel failed to conduct an adequate investigation into the factual bases and legal merit of the potential claims, the petitioner's habeas counsel failed to adequately articulate the factual and legal bases for his conclusion that the case is wholly frivolous, the habeas court failed to adequately evaluate whether the case was wholly frivolous, and the case is not wholly frivolous or the record does not demonstrate that the case is wholly frivolous." The introduction, in part, appears to assert claims of ineffective assistance of habeas counsel and erroneous actions of the habeas court. At oral argument, however, the petitioner's appellate counsel contended that those claims are not grounded in the ineffective assistance of habeas counsel, but in the denial of the right to counsel in the habeas proceeding to pursue the claimed ineffective assistance of trial counsel. We conclude, for purposes of this appeal, that this is a distinction without a difference.

The respondent argues that the claim that the habeas court improperly permitted counsel to withdraw should not be entertained on direct appeal from the judgment at issue.[3] Because there was no habeas trial to develop facts related to the efforts of trial counsel, the respondent contends that the record is inadequate for our review, given that the facts are limited to the record in the trial court. The respondent also argues that the petitioner's remedy is by way of a petition for a writ of habeas corpus pursuant to *Lozada* v. *Warden*, 223 Conn. 834, 613 A.2d 818 (1992) (petitioner entitled to seek writ of habeas corpus on ground that counsel in prior habeas proceeding had rendered ineffective assistance), alleging that Fox rendered ineffective assistance.

---

[3] There is no question that there is a final judgment as to the pro se petition for a writ of habeas corpus filed by the petitioner.

The effectiveness of habeas counsel, however, is not the issue on appeal. The issue is whether the habeas court properly determined that the petition for a writ of habeas corpus did not raise any nonfrivolous issues. To that end, the petitioner argues, the record is adequate for review because it contains all of the documents that the habeas court relied on when it granted the *Anders* motion and dismissed the petition for a writ of habeas corpus.[4] Under the limited circumstances of the issue on appeal, we agree with the petitioner.

Our first step is to review the allegations of the petition for a writ of habeas corpus to determine what allegations were before the habeas court. "The purpose of the [petition] is to put the [respondent] on notice of the claims made, to limit the issues to be decided, and to prevent surprise." (Internal quotation marks omitted.) *Jenkins* v. *Commissioner of Correction*, 52 Conn. App. 385, 406, 726 A.2d 657, cert. denied, 249 Conn. 920, 733 A.2d 233 (1999). "The petition for a writ of habeas corpus is essentially a pleading and, as such, it should conform generally to a complaint in a civil action." (Internal quotation marks omitted.) *Toccaline* v. *Commissioner of Correction*, 80 Conn. App. 792, 818, 837 A.2d 849, cert. denied, 268 Conn. 907, 845 A.2d 413, cert. denied sub nom. *Toccaline* v. *Lantz*, 543 U.S. 854, 125 S. Ct. 301, 160 L. Ed. 2d 90 (2004). "The principle that a plaintiff may rely only upon what he has alleged is basic. . . . It is fundamental in our law that the right of a plaintiff to recover is limited to the allegations of his complaint." (Internal quotation marks omitted.) *Holley* v. *Commissioner of Correction*, 62 Conn. App. 170, 181, 774 A.2d 148 (2001). A complaint includes

---

[4] The petitioner also argues that if this court concludes that the record is not adequate, the judgment of the habeas court should be reversed pursuant to the plain error doctrine. See Practice Book § 60-5. We decline the petitioner's invitation to reverse the judgment of the habeas court pursuant to plain error under such circumstances. If the record is inadequate for review, it is inadequate for plain error consideration.

all exhibits attached to it. See Practice Book § 10-29; *Streicher* v. *Resch*, 20 Conn. App. 714, 716, 570 A.2d 230 (1990).

"[T]he interpretation of pleadings is always a question of law for the court . . . . Our review of the [habeas] court's interpretation of the pleadings therefore is plenary. . . . [T]he modern trend, which is followed in Connecticut, is to construe pleadings broadly and *realistically*, rather than narrowly and technically. . . . [T]he [petition] must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory upon which it proceeded, and do substantial justice between the parties. . . . As long as the pleadings provide sufficient notice of the facts claimed and the issues to be tried and do not surprise or prejudice the opposing party, we will not conclude that the [petition] is insufficient to allow recovery." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Boone* v. *William W. Backus Hospital*, 272 Conn. 551, 559–60, 864 A.2d 1 (2005).

Pursuant to our plenary review of the petition for a writ of habeas corpus, we conclude that three issues were before the habeas court: whether the petitioner was denied the constitutional rights (1) to confront witnesses against him, (2) to the effective assistance of counsel and (3) to due process of law because he allegedly was sentenced in a manner that did not comply with our rules of practice and was not advised of the immigration consequences of his guilty plea.[5] As previously noted, the respondent contends that the claims are not reviewable because there was no habeas proceeding to develop facts related to the claim of ineffective assistance of habeas counsel.[6]

---

[5] In the context of the *Anders* motion, the third issue involved the alleged ineffective assistance of Gary A. Mastronardi, private counsel the petitioner retained subsequent to arraignment, as well as Fox' assessment of the validity of the petitioner's guilty plea.

[6] The respondent also argues that we should be guided by its argument in *Coleman* v. *Commissioner*, 99 Conn. App. 310, 913 A.2d 477, cert. denied,

In his appellate brief, the petitioner states that all of the relevant documents before the habeas court are available for our review.[7] Significantly, the petitioner attached exhibits to his petition for a writ of habeas corpus to support his various claims. Also, the habeas court had before it a transcript of the petitioner's plea canvass that Fox submitted by way of a supplemental motion to withdraw his appearance.

The potential, reviewable issues are controlled by the scope of the allegations in the petition for a writ of habeas corpus. "Factual allegations contained in pleadings upon which the cause is tried are considered judicial admissions and hence irrefutable as long as they remain in the case. . . . The admission of the truth of an allegation in a pleading is a judicial admission conclusive on the pleader. . . . A judicial admission dispenses with the production of evidence by the opposing party as to the fact admitted, and is conclusive

---

281 Conn. 924, 918 A.2d 275 (2007); see also *Coleman* v. *Commissioner of Correction*, 274 Conn. 422, 876 A.2d 533 (2005). Both *Coleman* decisions are procedurally distinguishable from this case. In those cases, the habeas courts granted the *Anders* motions for the special public defender to withdraw, but declined to appoint substitute counsel for the petitioner, who proceeded pro se at the habeas trial. The petitions for a writ of habeas corpus were dismissed, and certification to appeal was denied. The issue on appeal in both *Coleman* cases was whether the habeas court abused its discretion by denying the petitions for certification. See *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994); id., 616, citing *Lozada* v. *Deeds*, 498 U.S. 430, 432, 111 S. Ct. 860, 112 L. Ed. 2d 956 (1991). In this case, there was no habeas trial, but the habeas court belatedly granted the petition for certification to appeal after considering the question of whether it was improper to dismiss sua sponte the petition for a writ of habeas corpus without a trial. See footnote 2.

[7] Fox filed the *Anders* motion pursuant to Practice Book § 23-41, which requires a motion for leave to withdraw as appointed counsel to be sealed. This court granted the petitioner's motions requesting that the habeas court be ordered to unseal the *Anders* motion and supporting memorandum, the petitioner's objection thereto, Fox' supplemental motion for leave to withdraw appearance and the court's memorandum of decision. This court also ordered that the documents may be used in the appellate briefs and record on appeal without limitation.

upon the party making it." (Citations omitted; internal quotation marks omitted.) *Nationwide Mutual Ins. Co.* v. *Allen,* 83 Conn. App. 526, 541–42, 850 A.2d 1047, cert. denied, 271 Conn. 907, 859 A.2d 562 (2004).

We have reviewed the petition for a writ of habeas corpus, the documents attached thereto, the record, including the habeas court file, and conclude, pursuant to *Anders* v. *California,* 386 U.S. 738, 87 S. Ct. 1396, 18 L. Ed. 2d 493 (1967) (standard regarding withdrawal of counsel for frivolous appeals), *Hill* v. *Lockhart,* 474 U.S. 52, 57–58, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985) (to prevail on claim of ineffective assistance of counsel during plea negotiation, petitioner must show counsel's performance deficient and there is reasonable probability that but for counsel's errors, petitioner would not have pleaded guilty), *Strickland* v. *Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) (to prevail on claim of ineffective assistance of counsel, petitioner must show counsel's performance deficient and deficient performance prejudiced defense), General Statutes § 54-1j[8] and Practice Book §§ 23-41,[9] 38-18 through 39-21 and 39-24, that the record is adequate

[8] General Statutes § 54-1j (a) provides in relevant part: "The court shall not accept a plea of guilty or nolo contendere from any defendant in any criminal proceeding unless the court first addresses the defendant personally and determines that the defendant fully understands that if the defendant is not a citizen of the United States, conviction of the offense for which the defendant has been charged may have the consequences of deportation or removal from the United States, exclusion from readmission to the United States or denial of naturalization, pursuant to the laws of the United States. If the defendant has not discussed these possible consequences with the defendant's attorney, the court shall permit the defendant to do so prior to accepting the defendant's plea."

[9] Practice Book § 23-41 provides: "(a) When counsel has been appointed pursuant to Section 23-26, and counsel, after conscientious investigation and examination of the case, concludes that the case is wholly frivolous, counsel shall so advise the judicial authority by filing a motion for leave to withdraw from the case.

"(b) Any motion for leave to withdraw shall be filed under seal and provided to the petitioner. Counsel shall serve opposing counsel with notice that a motion for leave to withdraw has been filed, but shall not serve

for our review of the petitioner's claim that the habeas court improperly granted the *Anders* motion.

We decline to review, however, any claims with respect to the ineffective assistance of habeas counsel raised in the petitioner's appellate brief, as those claims were not before the habeas court. Appellate courts of this state, generally, do not review claims raised for the first time on appeal. See *Kelley* v. *Commissioner of Correction*, 90 Conn. App. 329, 335, 876 A.2d 600, cert. denied, 276 Conn. 909, 886 A.2d 423 (2005). In his petition for a writ of habeas corpus, the petitioner alleged only that he was denied due process because he was denied the right to the effective assistance of trial counsel. The question for the habeas court, therefore, was whether, on the basis of the petitioner's allegations relating to the ineffective assistance of trial counsel, it should grant the *Anders* motion.

Although the petitioner claims that the habeas court improperly dismissed his petition for a writ of habeas corpus, he failed to brief that issue on appeal, despite having preserved the issue in the habeas court. In a request for reconsideration, Zeldis raised the issue of whether the court properly granted the *Anders* motion and sua sponte dismissed the petition for a writ of habeas corpus without giving the petitioner an opportunity to be heard. See footnote 2. The habeas court addressed those issues in its memorandum of decision.

opposing counsel with a copy of the motion or any memorandum of law. The petitioner shall have thirty days from the date the motion is filed to respond in writing.

"(c) The judicial authority may order counsel for the petitioner to file a memorandum outlining:

"(1) the claims raised by the petitioner or any other potential claims apparent in the case;

"(2) the efforts undertaken to investigate the factual basis and legal merit of the claim;

"(3) the factual and legal basis for the conclusion that the case is wholly frivolous."

This court, however, does not review claims that are merely asserted without the benefit of legal analysis. We therefore consider the claim abandoned. See *Ziemba* v. *Commissioner of Correction*, 90 Conn. App. 70, 71, 875 A.2d 597, cert. denied, 276 Conn. 905, 884 A.2d 1029 (2005).

## II

## STANDARD OF REVIEW

Again, the parties do not agree as to the standard of review to be applied to the issues on appeal, and this question appears to be one of first impression. We conclude on the basis of *Anders* v. *California*, supra, 386 U.S. 738, that the de novo standard of review applies. See also *State* v. *Pascucci*, 161 Conn. 382, 288 A.2d 408 (1971); *Fredericks* v. *Reincke*, 152 Conn. 501, 208 A.2d 756 (1965). A review of the development of the *Anders* doctrine informs our decision.

The issue in *Anders* was "the extent of the duty of a court-appointed appellate counsel to prosecute a first appeal from a criminal conviction, after that attorney ha[d] conscientiously determined that there [was] no merit to the indigent's appeal." *Anders* v. *California*, supra, 386 U.S. 739. After Anders was convicted of felony possession of marijuana, he sought an appeal and asked the state to appoint counsel to represent him. Counsel was appointed, and after counsel studied the record and spoke with Anders, he concluded that there was no merit to an appeal. Id. Counsel advised the court by letter and told the court that Anders wanted to file a brief pro se. Anders then asked for the appointment of substitute counsel, which request the court denied. The state of California responded, and Anders filed a reply brief. Anders' conviction was affirmed. Id., 739–40. Anders then filed a petition for a writ of habeas corpus in the state court, claiming that he had been deprived of the right to counsel at the appellate stage of the

proceedings. Id., 740. The petition was denied, and Anders filed a petition for a writ of habeas corpus with the California Supreme Court, alleging that both the trial judge and the prosecutor had commented on his failure to testify. The California Supreme Court denied the petition. Id., 740–41. The United States Supreme Court concluded that California's action did not comport with fair procedure and lacked the equality required by the fourteenth amendment. Id., 741.

"The constitutional requirement of substantial equality and fair process can only be attained where counsel acts in the role of an active advocate in behalf of his client, as opposed to that of *amicus curiae*. . . . Counsel should, and can with honor and without conflict, be of more assistance to his client and to the court. His role as an advocate requires that he support his client's appeal to the best of his ability. Of course, if counsel finds his case to be wholly frivolous, after a conscientious examination of it, he should so advise the court and request permission to withdraw. That request must, however, be accompanied by a brief referring to anything in the record that might arguably support the appeal. A copy of counsel's brief should be furnished the indigent and time allowed him to raise any points that he chooses; the court—not counsel—then proceeds, after a full examination of all the proceedings, to decide whether the case is wholly frivolous. If it so finds it may grant counsel's request to withdraw and dismiss the appeal insofar as federal requirements are concerned, or proceed to a decision on the merits, if state law so requires. On the other hand, if it finds any of the legal points arguable on their merits (and therefore not frivolous) it must, prior to decision, afford the indigent the assistance of counsel to argue the appeal.

"This requirement would not force appointed counsel to brief his case against his client but would merely

afford the latter that advocacy which a nonindigent defendant is able to obtain. It would also induce the court to pursue all the more vigorously its own review because of the ready references not only to the record, but also to the legal authorities as furnished it by counsel. . . . Moreover, such handling would tend to protect counsel from the constantly increasing charge that he was ineffective and had not handled the case with that diligence to which an indigent defendant is entitled." (Emphasis in original.) Id., 744–45.

Our Supreme Court's decision in *State* v. *Pascucci,* supra, 161 Conn. 382, emphasizes the role of the court in reviewing the record to determine whether there are nonfrivolous issues that should be examined on appeal. "[T]he record clearly demonstrates that counsel served as an active and conscientious advocate to the full extent of his professional responsibility and obligation. There is merit, however, to the second claim of the defendant which is that the record discloses that the court only accepted the report of the special public defender. The mere acceptance of the report falls short of compliance with the federal requirement as mandated in the *Anders* case . . . which specifies that the court—not counsel . . . after a full examination of all the proceedings . . . decide[s] whether the case is wholly frivolous. That such a specific judicial determination is required is further indicated by the additional observation in the *Anders* case . . . that the brief or report required from counsel would also induce the court to pursue all the more vigorously its own review because of the ready references not only to the record, but also to the legal authorities as furnished by counsel. The record gives no indication that the court itself made the review and judicial determination which the *Anders* decision requires and, since it made no finding and filed no memorandum of decision, we cannot conclude from the cryptic notation 'Report Accepted' that it did so."

(Citations omitted; internal quotation marks omitted.)
Id., 386.

*Anders* and *Pascucci* stand for the proposition that when a motion to withdraw as counsel is filed asserting that there are no nonfrivolous issues on appeal, the court is required to review the entire record before it, including the pleadings and evidence. The court's ultimate determination is a mixed question of law and fact. The de novo standard of review is applicable to such determinations of a trial or habeas court's decision. See *State* v. *Kirby*, 280 Conn. 361, 394, 908 A.2d 506 (2006). Furthermore, it is only logical that this court review the entire record before the habeas court, as the federal and state precedents require this of the habeas court itself. In effect, in our de novo review, we undertake an *Anders* style of review of the *Anders* decision.

### III

### FACTS

The following facts, as alleged in the pro se petition for a writ of habeas corpus, which was filed on December 3, 2001, are relevant to our resolution of the petitioner's appeal.[10] On March 29, 2000, the petitioner willingly walked into the Stamford police station and stated that he was responsible for the death of his cousin, Renee Jean Bernadel, an event that had occurred earlier that evening. He was charged with murder and arraigned the following day. Because he was found to be indigent, a public defender, Susan M. Hankins, was appointed to represent him. Hankins attended a pretrial conference during which the state agreed to a sentence of twenty years if the petitioner pleaded guilty to a charge of

---

[10] In his petition for a writ of habeas corpus, the petitioner made reference to various documents that he attached to the petition as exhibits. The relevant portions of those exhibits are set forth in the footnotes of this opinion.

manslaughter. Hankins did not accept the plea offer because the petitioner never authorized her to do so.[11]

The petitioner, believing that he would receive better representation if he retained private counsel, with the help of his family, retained Gary A. Mastronardi to represent him. Mastronardi's fee was $15,000 if the matter was resolved without a trial, and $15,000 more if the matter went to trial. Members of the petitioner's family thought that they could pay the entire fee of $30,000 over time, and Mastronardi agreed to take an initial payment of $10,000 to represent the petitioner.

On the basis of Mastronardi's advice, the petitioner's family paid an additional $1000 for the petitioner to undergo a psychiatric evaluation by Kenneth M. Selig, who is board certified in psychiatry and neurology and also a member of the Connecticut Bar Association, to determine whether there were mitigating circumstances to sustain a defense of extreme emotional disturbance. Selig reviewed the investigator's report from the public defender's office that included police reports and statements by various witnesses, Bernadel's autopsy report, the petitioner's educational records from the Connecticut schools he attended and his

---

[11] In a letter to the petitioner dated November 5, 2001, Hankins stated the following: "Regarding your inquiry concerning the pretrial negotiations. There were pretrial conferences concerning your case. The people present at the pretrial were the prosecutor, the judge and me. The prosecutor discussed with me whether you would be willing to plead to manslaughter for an agreed [twenty] year sentence. At the time of the pretrial discussions, I explained to you that manslaughter carried a lower maximum sentence of [twenty] years, that murder had a maximum of [sixty] years and a minimum of [twenty-five] years; that murder sentences were not subject to any reduction in time, while manslaughter sentences were treated as other crimes, like robbery or assault. There would never have been a [ten to twenty] year offer, as referred to in your letter, because there are no longer indeterminate sentences. As you have indicated in your letter, I informed you that we would be able to resolve the case as a manslaughter if I went back to the prosecutor with your position. However, there was never a firm offer of the manslaughter and [twenty] years, because you did not authorize me to make that agreement on your behalf."

records from the department of correction, including his medical and mental health records.[12] Selig met with the petitioner on December 12, 2000, for approximately one hour and fifteen minutes. Selig questioned the petitioner about his education in the Connecticut schools and his adjustment to life in prison. The petition alleges that Selig did not question the petitioner about his life in Haiti or the night of Bernadel's murder.

The petitioner also alleged that Selig found no psychological effect that would sustain a defense of extreme emotional disturbance. Selig concluded that additional testing *may* reveal brain damage, as the petitioner had reported having head injuries, and that such testing would cost thousands of dollars.[13] Members of

[12] The petitioner alleged that Selig was not given records of his childhood, culture and family background in Haiti, and that Mastronardi did not obtain such information from the Haitian consulate. The petitioner, his mother and brothers and sisters emigrated to the United States in 1994 to join his father, who had arrived in the 1980s.

[13] Selig's report stated in part: "On the basis of the aforedescribed evaluation, it is my opinion that [the petitioner] is competent to stand trial, was not insane at the time that he allegedly stabbed the victim in this case, and would have a very hard time sustaining a defense of extreme emotional disturbance. [The petitioner] does have a history of violent conduct and has been arrested on three previous occasions, all for fighting and all in Stamford. He describes a long history of problems with his temper and was expelled from high school for fighting and needed to be home schooled the last two years because of his behavior.

"He has had trouble adjusting to being incarcerated, but not to the point that he has received medications, in part because he has refused to take medications. When I interviewed him, I saw no indication for psychiatric medications. There is no doubt that [the petitioner] has problems controlling his anger and has a tendency to get enraged and then to feel remorseful afterwards, but this would not constitute a defense. There may be some underlying paranoia and suspiciousness about him, but this does not rise to the level of mental disease or defect. He indicates that he has lost his temper both provoked and unprovoked, and there is a possibility that he has Intermittent Explosive Disorder, but I cannot be certain of that at this time.

"His history of explosive disorders *may be* related to brain damage which could be more fully explored with psychological testing, neuropsychological testing, an [electroencephalogram] of his brain, and [a magnetic resonance image] of his brain. He does report a past history of numerous head injuries, although he has never lost consciousness, and I do not find any significant cognitive problems during my interview. Nonetheless, a full and thorough

the petitioner's family could not provide additional financial resources for the psychiatric evaluations or the balance of Mastronardi's retainer.

The petitioner alleged that because his family could provide no additional financial assistance, Mastronardi should have withdrawn as counsel and let the office of the public defender represent him again. He further alleged that Mastronardi suggested that he plead guilty to the crime of murder and accept a sentence of twenty-five years in prison.[14] "In considering . . . Mastronardi's advice," the petitioner entered a guilty plea to

evaluation would include the aforedescribed tests, but these would require substantial additional sums ([a magnetic resonance image] alone is probably $1,000 and the psychological and neuropsychological testing would be another probably $2,000 and so on). Whether or not you wish to pursue this is your decision, but it is my judgment that after we got through with all of that testing, there is a low likelihood that we would find evidence of brain damage. This is particularly the case since there is no evidence from his school records that he was significantly cognitively impaired." (Emphasis in original.)

[14] In a letter to the petitioner dated February 23, 2001, Mastronardi stated in part: "First, I will tell you what occurred at the pretrial. At the pretrial, the state informed Judge Kavanewsky that the only charge to which it would accept a guilty plea from you would be murder. The prosecutor also informed the judge that he believed that an appropriate sentence for you on that charge was thirty years. If you were to plead guilty to murder, that charge carries with it a mandatory *minimum* of twenty-five years. After listening to the state, the judge informed me that, based upon the facts of the case, and based upon the unwillingness of the state to reduce the charge to something other than murder, (for example manslaughter), the best he would be able to do in this instance would be to sentence you, upon a plea of guilty to the murder charge, to a term of twenty-five years.

"Since, under the law, the prosecutor and *only* the prosecutor controls what charge you are permitted to plead guilty to, there is virtually nothing that I, or even the judge for that matter, can do. The prosecutor also informed both the judge and me during the pretrial that the reason the state was insisting on a plea of murder rather than some lesser charge was because . . . Bernadel's parents, Paulette and Beauvil, had sent him a letter in which they requested that the state prosecute you to [the] fullest extent possible under the law. In fact, in the letter, the parents ask that you receive 'life' in prison as a sentence. While the prosecutor obviously does not believe that 'life' would be an appropriate sentence, he claims he is under tremendous pressure from Bernadel's family to push for a substantial sentence and that this is the reason he is unwilling to reduce the murder charge against you.

"If the state refuses to reduce the charge, the best offer I can get for you from the judge is the 'mandatory minimum' permitted under the murder

the charge of murder. The petitioner also alleged that
during his plea canvass, he did not understand many
of the questions from the court, but that Mastronardi
coerced him to respond. The petitioner was scheduled
to be sentenced on June 13, 2001, after a presentence
investigation report was completed.

The petitioner alleged that he was interviewed by a
probation officer, who issued the presentence investiga-
tion report, which stated that the petitioner was the
product of a stable upbringing and that he demonstrated
no remorse for the victim. The petitioner also alleged
that there never was any investigation of his upbringing
in Haiti to determine whether he was the product of a
stable upbringing. Furthermore, contrary to the report
that the petitioner expressed no remorse, the report,
in fact, contained the petitioner's statement express-
ing remorse.[15]

statute—that is, twenty-five years. As I said, the judge indicated to me during
the pretrial that if you were willing to plead guilty to the prosecutor's murder
charge, he would be willing to impose the minimum sentence permitted
under law—twenty-five years. Your case was then continued by the judge
until March 16 in order to give me time to meet with you to discuss our
options.

"It is my intention to visit you at [the MacDougall-Walker Reception/
Special Management Unit] sometime before March 16 to discuss the judge's
offer. During our meeting, you and I will have to make a decision as to
whether to accept the judge's offer or take your case to trial. So that, when
I come to Walker, we can intelligently discuss your case, I am providing
for your review in advance of our meeting the enclosed documents. Please
read the witness statements carefully. If we went to trial, these are the
people the state would call to testify against you and the statements indicate
exactly what the testimony would be. Also enclosed is a copy of the letter
the state received from Bernadel's parents asking that you receive a life
sentence. Please read everything I have enclosed and be ready to discuss
your case with me when we meet." (Emphasis in original.)

[15] The presentence investigation report quoted the statement the petitioner
made to the police. "I was at my house at Frank Street. I was in my room
and heard my mother arguing with someone out in the hallway. I heard my
mother say, 'Why you hit me?' I got up and looked out the window and
seen a bunch of people on the front porch, including my mom and dad. I
went back to the kitchen and got a long kitchen knife. As I came back out
to the porch, I had the knife in my back pocket, and then I see this Haitian
guy. His name is [Bernadel]. He pushed my dad. My dad is sixty-six years
old. My mom and this guy, [Bernadel], were arguing also. My mom was

The petitioner further alleged that at the time of sentencing, Mastronardi neither objected to the representation in the report that the petitioner did not express remorse, nor advised the court that there was insufficient information to determine that the petitioner was

telling [Bernadel] to stop hanging around with my brother. Every time [Bernadel] would hang around with my brother, my brother would get into trouble. While all this was going on [Bernadel] had two of his friends there, one of them lives upstairs. I don't know either of their names. They were just staying there, they weren't involved. I told [Bernadel] 'Why are you arguing with my parents? They are old people. Why don't you walk away?' Then we got into an argument. [Bernadel] said, 'I'm going to kill you.' After he said that, [Bernadel] left with his two friends, he was driving a blue Honda Civic. I don't know where they were going. I thought he was going to come back to my house and kill me, so I left and went for a ride to cool down. I took the knife with me. When someone says they are going to kill you, you need some protection. I took it very seriously when he made that comment. My parents stayed at home.

"After driving around for about five minutes, I was driving up East Main Street towards the Chinese restaurant when I seen my mother with a bunch of people on Lawn Avenue and I saw that [Bernadel's] car was there, the same blue Honda Civic. Then I seen him arguing with my mother. I thought he was looking for me. I got out of my car and there was a bunch of [Bernadel's] friends out there. My mom and him were still arguing when I got out of the car. The victim saw me and picked up an object and he faced my direction. I panicked and lost control.

"I'm truly sorry for my actions every day. I ask the Lord for forgiveness, as I shall carry the burden, the shame, the torment for the rest of my life. I know I must be punished. All I ask is that my sentence be weighed by the punishment I carry each and every day. I know given a chance, I can do better for my family and others. I cannot forgive myself nor do I ask for forgiveness, as I have no right. What I ask for is an opportunity."

The presentence investigation report stated in part: "According to [the petitioner], he is in good physical health and has no history of mental illness or treatment. He stated that since his incarceration he does see the psychiatrist every two weeks and was taking medication for depression but he is no longer on this medication. . . .

"[The petitioner] appears before the court for sentencing after having previously entered a guilty plea to murder. [He] is the product of a stable upbringing. Despite the absence of his father for a period of time, his mother maintained a loving and supportive home until the family was reunited in 1994. [The petitioner] appears to have his high school education and has maintained stable employment for the past few years. He is the father of one child for whom he has never taken responsibility either financially or emotionally. [He] does not have a lengthy criminal history, however this offense has resulted in the loss of another's life. [*The petitioner*] *does not express any remorse for his victim, only remorse for the consequences he faces based on his own actions.* In this officer's opinion, as well as the point of view expressed by the victim's family, that no sentence can make

the product of a stable upbringing. The petitioner concluded, therefore, that the trial court relied on inaccurate information and sentenced him to twenty-seven years in prison, which was contrary to Mastronardi's representation.

The petitioner alleged as the factual basis for his claims that neither the trial court nor Mastronardi advised him that there was a probability that he would be deported upon completion of his sentence. He also alleged that he was never advised of his immigration "rights" upon arrest, plea or sentence.

The petitioner alleged that Mastronardi violated rule 1.16 of the Rules of Professional Conduct and rendered ineffective assistance by failing to obtain psychological testing contrary to *Copas* v. *Commissioner of Correction*, 234 Conn. 139, 158, 662 A.2d 718 (1995). Furthermore, the petitioner alleged, Mastronardi provided ineffective assistance of counsel by failing to inform him that his sentence could exceed twenty-five years, in violation of Practice Book §§ 39-19[16] and 39-20,[17] and

the victim whole again. Therefore, this offense requires a substantial punishment. A long-term period of incarceration is warranted to show [the petitioner] the value of human life and that there must be consequences for his actions." (Emphasis added.)

[16] Practice Book § 39-19 provides in relevant part: "The *judicial authority* shall not accept the plea without first addressing the defendant personally and determining that he . . . fully understands:

"(1) The nature of the charge to which the plea is offered;

"(2) The mandatory minimum sentence, if any;

"(3) The fact that the statute for the particular offense does not permit the sentence to be suspended;

"(4) The maximum possible sentence on the charge . . .

"(5) The fact that he . . . has the right to plead not guilty or to persist in that plea if it has already been made, and the fact that he . . . has the right to be tried by a jury or a judge and that at that trial the defendant has the right to the assistance of counsel, the right to confront and cross-examine witnesses against him . . . and the right not to be compelled to incriminate himself . . . ." (Emphasis added.)

[17] Practice Book § 39-20 provides in relevant part: "The *judicial authority* shall not accept a plea of guilty . . . without first determining, by addressing the defendant personally in open court, that the plea is voluntary and is not the result of force or threats or of promises apart from a plea agreement. The judicial authority shall also inquire as to whether the defendant's willing-

by failing to object to the presentence investigation report in violation of Practice Book § 43-10. The petitioner also alleged that Mastronardi's failure to object to the report violated his constitutional right to confront witnesses against him.[18]

The petitioner further alleged that the trial court violated his right to due process by accepting his guilty plea without informing him of the probable immigration consequences in violation of General Statutes § 54-1j. The petitioner further claims that because he did not know of the probable immigration consequences, his guilty plea was involuntary.

The relief the petitioner sought was withdrawal of his guilty plea. He also asked that the court appoint counsel to represent him in the habeas proceedings. The court, *Hon. Richard M. Rittenband*, judge trial

ness to plead guilty . . . results from prior discussions between the prosecuting authority and the defendant or his . . . counsel." (Emphasis added.)

[18] This claim is without legal basis. "A sentencing judge has very broad discretion in imposing any sentence within the statutory limits and in exercising that discretion he may and should consider matters that would not be admissible at trial. . . . To arrive at a just sentence, a sentencing judge may consider information that would be inadmissible for the purpose of determining guilt [and] evidence of crimes for which the defendant was indicted but neither tried nor convicted . . . . Generally, due process does not require that information considered by the trial judge prior to sentencing meet the same high procedural standard as evidence introduced at trial. Rather, judges may consider a wide variety of information. . . . Consistent with due process the trial court may consider responsible unsworn or out-of-court information relative to the circumstances of the crime and to the convicted person's life and circumstance. . . . It is a fundamental sentencing principle that a sentencing judge may appropriately conduct an inquiry broad in scope, and largely unlimited either as to the kind of information he may consider or the source from which it may come." (Citations omitted; internal quotation marks omitted.) *State* v. *Bletsch*, 281 Conn. 5, 20, 912 A.2d 992 (2007).

"The sole purpose [of a presentence investigation report] is to enable the court, within limits fixed by statute, to impose an appropriate penalty, fitting the offender as well as the crime. . . . The primary value of a [presentence investigation report] stems from the information contained therein, not from the report itself. Most of this information can be brought to the trial court's attention by either party by means other than a [presentence investigation report]." (Citation omitted; internal quotation marks omitted.) *State* v. *Patterson*, 236 Conn. 561, 574-75, 674 A.2d 416 (1996).

referee, appointed Fox to represent the petitioner on May 21, 2002.

On November 18, 2003, Fox filed an *Anders* motion, reciting the history of the underlying criminal case that is substantially similar to the facts alleged in the petition for a writ of habeas corpus. Fox also represented that, according to Mastronardi, after he told the petitioner in a letter that the best resolution of the matter was a sentence of twenty-five years, Mastronardi informed the petitioner that the representation of a twenty-five year sentence was an error on his part and that the trial court had indicated a cap of thirty years incarceration with the right to argue for less at sentencing. At sentencing, Mastronardi argued for a sentence of fewer than thirty years and the petitioner was sentenced to twenty-seven years in prison, which conformed with the plea agreement. Fox pointed out that there was confusion over the presentence investigation report as to whether the petitioner felt remorse for Bernadel's murder, but noted that the petitioner apologized for the murder in open court at the time he was sentenced.[19]

Fox noted the petitioner's allegation that the psychological evaluation Mastronardi obtained was inadequate and that Mastronardi's failure to obtain a magnetic resonance image (MRI) and an electroencephalogram (EEG) amounted to ineffective assistance of counsel. The petitioner filed similar allegations against Mastronardi in a grievance complaint. In response to the grievance allegations, Mastronardi asserted that Selig's evaluation was complete and authoritative, and that there was no reasonable basis for obtaining an MRI or other tests. As to the petitioner's claim that he believed he was to be sentenced to twenty-five years in prison

---

[19] Mastronardi requested that the petitioner be permitted to speak. The petitioner stated: "I want to say that I'm very sorry for what I did. I apologize to the court, to my mother and father. But most of all, I want to say I'm sorry to the Bernadel family. I hope they can forgive me some day."

if he pleaded guilty, Mastronardi represented that he corrected his error as to the plea offer and that on the day of the plea, the petitioner understood that the plea offer was for a cap of thirty years with the right to argue for less.

In his grievance complaint, the petitioner also alleged that because his parents had not paid Mastronardi his full fee, Mastronardi had a duty to withdraw and turn the matter over to the office of the public defender and that the public defender's office would pay for the more extensive testing, successfully defending him on the basis of brain damage. Mastronardi responded that the claim was "preposterous."

With respect to the petitioner's habeas allegations that cultural factors should have been raised in his defense, the petitioner also included that claim in his grievance complaint, as well as a claim that because he failed to complete high school and had a poor understanding of English, a Creole interpreter should have been provided for him. Mastronardi responded that he never had any indication that the petitioner did not understand what was being said to him or that the petitioner's own statements in English were not understood. Fox also represented that in his interaction with the petitioner, there was never a suggestion that the petitioner did not understand conversations conducted and letters and documents written in English.

In his grievance complaint and petition for a writ of habeas corpus, the petitioner alleged that he was not advised that noncitizens might be subject to immigration consequences if convicted of murder. Mastronardi indicated that the petitioner was mistaken and that the plea canvass included a noncitizen advisement.

In the *Anders* motion, Fox concluded that there was no credible basis for the petitioner to allege ineffective

assistance of counsel against either Hankins or Mastro-
nardi and that the petitioner's claims were frivolous.
Fox noted that in addition to the overwhelming evi-
dence from numerous witnesses to the crime, the peti-
tioner freely admitted to having committed it. The
petitioner's hope was that if the case had gone to a
jury, he might have been able to convince the jury to
find him guilty of manslaughter. After reviewing all of
the witness statements, police reports and other materi-
als gathered by Hankins and Mastronardi, there was no
reasonable basis for the petitioner to risk trial by jury
in the hope of obtaining a conviction on a lesser offense.
The offsetting danger was the chance of being convicted
of murder and sentenced to incarceration for more than
twenty-seven years. On the basis of his review of all of
the records of the underlying crime, Fox concluded that
the claims of ineffective assistance of counsel against
Hankins and Mastronardi were frivolous and without
merit, and sought the court's permission to withdraw
as counsel pursuant to *Anders* v. *California*, supra, 386
U.S. 738, and *Franko* v. *Bronson*, 19 Conn. App. 686,
563 A.2d 1036 (1989).[20]

Fox also represented that the petitioner had received
notice of the *Anders* motion and had thirty days within
which to respond in writing. Furthermore, Fox stated
that if the petitioner filed an objection, he had the right
to a hearing in which the court, in its discretion, could
deny the request to withdraw or authorize the petitioner
to proceed pro se.

On December 17, 2003, the petitioner filed a "motion
to object" to the *Anders* motion. He argued that his
petition was not frivolous, that it was not entirely with-
out merit and that he inadvertently caused the death

---

[20] Subsequent to the date Fox filed the *Anders* motion, this court modified
some of the *Franko* procedures in *Vazquez* v. *Commissioner of Correction*,
88 Conn. App. 226, 869 A.2d 234 (2005). Those procedural changes do not
affect this case.

of Bernadel through a stab wound. He also argued that a jury should decide if the claim of ineffective assistance of counsel was without merit.[21] He cited the standard established in *Strickland* v. *Washington*, supra, 466 U.S. 668, and claimed that his guilty plea was the result of ineffective assistance of counsel because there is a reasonable probability that but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. The petitioner stated that "[t]he main issue in dispute of . . . Fox' motion, is that he states . . . 'Mastronardi indicated to [the] petitioner that the twenty-five year offer was an error on his part.' [The] [p]etitioner does not agree with this and obviously . . . Fox has taken [a] position with . . . Mastronardi on this issue." The petitioner then referred to the letter Mastronardi had sent him on February 23, 2001.

The petitioner also argued in his objection to the *Anders* motion that the only effort Fox made was a telephone call to Mastronardi, the conversation was not recorded and that there is no way of knowing what was revealed. He concluded that a jury should decide the question on "the weight of the [February 23, 2001] letter."

The petitioner also stated that he was invoking his sixth amendment right to counsel at this critical stage of the habeas proceeding. He asked that Fox' request to withdraw be denied and, in the alternative, that either substitute counsel be appointed or Fox be ordered to stay on the case until a hearing was held on the matter.

In response to the petitioner's objection and at the request of the habeas court, Fox filed a supplemental *Anders* motion with a transcript of the petitioner's plea hearing on April 16, 2001. The transcript reveals that

---

[21] Habeas corpus proceedings are civil in nature; *Collins* v. *York*, 159 Conn. 150, 153, 267 A.2d 668 (1970); and the petitioner has no constitutional right to a jury trial.

the trial court conducted the following plea canvass of the petitioner:[22]

"The Court: All right. This case has been discussed with me, I know, but the state will put any plea agreement on the record.

"[The Prosecutor]: Yes. If the court please, the state will recommend at the time of sentencing that the [petitioner] receive a sentence of thirty years in state prison.

"The Court: All right. And I did say to Mr. Mastronardi and I say to this [petitioner], of course, the mandatory minimum for this plea is twenty-five years incarceration, but I would consider argument after reading the [presentence investigation report] and I would consider argument and sentence to no more than thirty, but to no less than twenty-five. I would consider a sentence of twenty-five years incarceration, but I'm not making a commitment to that at this time. I think that's a fair summary of my representations. All right. Let me canvass this [petitioner]. . . . [H]ow old are you, sir?

"[The Petitioner]: Twenty-three.

"The Court: All right. And can you tell me what's the highest level of schooling that you finished?

"[The Petitioner]: Twelfth grade.

---

[22] Prior to the canvass, the prosecutor provided the trial court with the following factual basis for the murder charge against the petitioner. "[T]his incident, as the [court] clerk indicated, took place on the thirtieth of March of the year 2000 at approximately quarter to ten in the evening. There was an earlier altercation that evening between the victim and the relatives of the [petitioner].

"At the time in question on Lawn Avenue here in Stamford, the victim was standing, talking to some people at Lawn Avenue when the [petitioner] drove up, apparently because of the earlier altercation, was angry at [Bernadel] and with a knife in his hand started chasing [Bernadel] down the street on Lawn Avenue. At some point during the chase, [Bernadel] tripped and fell, at which point the [petitioner] came upon [Bernadel] and stabbed him with what turned out to be some type of kitchen knife. That stabbing caused a fatal wound, and the victim, Renee Jean Bernadel, died from that stabbing."

"The Court: Are you now under the influence of any alcohol, drugs or medication which would affect your ability to understand what's happening today? I can't hear you.

"[The Petitioner]: I was taking medication, but I stopped right now. I'm not on medication.

"The Court: You are not now on any medication?

"[The Petitioner]: No.

"The Court: Have you had enough time to talk to your attorney about this matter in your decision to plead guilty today?

"[The Petitioner]: Yes.

"The Court: And are you satisfied with your attorney's advice and representation?

"[The Petitioner]: Yes.

"The Court: Have you discussed with your attorney the nature and elements of the crime that you are pleading to and the general nature of the evidence the state says that it has against you?

"[The Petitioner]: Yes.

"The Court: Essentially, the state would have to prove that you caused the death of Mr. Bernadel with the intent to cause the death of Mr. Bernadel. Do you understand that's what the state would have to prove to convict you of the crime of murder? Do you understand that?

"[The Petitioner]: Yes.

"The Court: You have to speak up so I can hear you.

"[The Petitioner]: Yes.

"The Court: All right. And you understand the maximum penalty here is sixty years incarceration. The mandatory minimum penalty by statute is twenty-five years incarceration. Do you understand that?

"[The Petitioner]: Yes.

"The Court: There are also fines, but there is no fine as any part of a plea agreement, so that's of no relevance here. Do you understand that, too?

"[The Petitioner]: Yes.

"The Court: Are you on probation or parole anywhere?

"[The Petitioner]: No.

"The Court: Do you understand that by pleading guilty, you are giving up certain of your rights? You're giving up your right to a trial with the assistance of your attorney, your right against self-incrimination, the right to continue to plead not guilty and have the state prove your guilt beyond a reasonable doubt, the right to confront and cross-examine the witnesses against you, the right to testify and the right to present any defenses you have. Do you understand by pleading guilty today, you're giving up all of those rights?

"[The Petitioner]: Yes.

"The Court: If you are not a citizen of the United States, I have to tell you that conviction of the offense for which you've been charged and that you're pleading to may have consequences of deportation, exclusion from admission to the United States or denial of naturalization pursuant to the laws of the United States. Do you understand that, too?

"[The Petitioner]: Yes.

"The Court: Now, please listen carefully to this as well. The plea agreement here is as follows. I'm going

to order a presentence investigation. Based upon that, based upon what I hear from the attorneys, from you, if you wish, and others on your behalf, based upon what I hear from representatives of the victim, I will decide what sentence to impose. However, the state is recommending a sentence of thirty years in jail. I will not impose a sentence of more than thirty years. If I do, you'll be allowed to withdraw your plea. But if I impose a sentence of thirty years or less down to twenty-five, then you are bound by that plea and that sentence. Do you understand that?

"[The Petitioner]: Yes.

"The Court: And as I said to your attorney, I will consider a lesser sentence down to the statutory mandatory minimum of twenty-five years. So, you're going to have a right to argue for that. And I'll decide what sentence is right to impose within that window of twenty-five to thirty years in jail. Do you understand that?

"[The Petitioner]: Yes.

"The Court: Has anything else been promised to you to get you to plead guilty, anything at all? You have to answer out loud. If you have a question, you can talk to your lawyer. But my question is, has anything else been promised to you other than what I have just said?

"[The Petitioner]: No.

"The Court: All right. Is that a fair representation of the plea agreement?

"[The Prosecutor]: Yes, it is, Your Honor.

"The Court: Mr. Mastronardi?

"[The Petitioner's Counsel]: To my understanding, yes, Your Honor.

"The Court: All right. Do you have any questions about that, sir? Do you have any questions about that plea agreement?

"[The Petitioner]: No.

"The Court: Is that the plea agreement you wish to accept?

"[The Petitioner]: Yes.

"The Court: And you heard the state's attorney tell me what the facts were. Were those facts substantially correct; that is, you did what the state says you did? Was that substantially correct?

"[The Petitioner]: Yes.

"The Court: All right. Does either attorney know of any reason why I should not accept the plea?

"[The Prosecutor]: No, Your Honor.

"[The Petitioner's Counsel]: No, Your Honor.

"The Court: Okay. I see the victim's advocate here, I assume with representatives of the victim. . . . All right. Then I'll make a finding that this [petitioner's] plea is voluntarily and understandingly made with the assistance of competent counsel, there's a factual basis for the plea. The plea is accepted, and a finding of guilty shall enter. I'll continue this matter for a presentence investigation."

On the basis of its review of the *Anders* motion and objection, the habeas court granted the motion to withdraw and sua sponte dismissed the petition for a writ of habeas corpus in its April 21, 2004 memorandum of decision. The court stated that the issues were whether the petitioner's conviction was illegal because (1) it resulted from the ineffective assistance of counsel and (2) he was not advised of the immigration consequences of his guilty plea. As to the petitioner's first claim, the

habeas court concluded that "the petitioner asserts ineffective assistance of counsel on the grounds that he was denied his right to confront adverse witnesses and was sentenced upon a guilty plea that did not comply with the relevant Practice Book provisions. [Fox] contends, and the record indicates, that the petitioner waived his rights to confront witnesses and that the guilty plea complied with §§ 39-19 and 39-20 of the Practice Book."

Although the petitioner claimed that Mastronardi failed to advise him of the immigration consequences of his guilty plea, the habeas court found that "a review of the trial transcript reveals that the court advised the petitioner of the consequences of a guilty plea on his immigration status. The record indicates that the petitioner was informed by the court of possible immigration consequences. . . . Specifically, [the trial] court informed the petitioner of the possibility of deportation, excluding the petitioner from the United States or the denial of naturalization. . . . The petitioner acknowledged during the court's canvass that he understood the possible consequences of his guilty plea on his immigration status. . . . Therefore, [Fox'] argument that no nonfrivolous claim exists with regard to the advisement of the petitioner of the possible immigration consequences of his guilty plea is supported by the record." (Citations omitted.)

The habeas court concluded "after reviewing the entire file and reading the petitioner's memorandum, that the petitioner is unable to substantiate his claims. The petitioner has failed to demonstrate that there are any nonfrivolous claims to be tried." The habeas court sua sponte dismissed the petition for a writ of habeas corpus pursuant to Practice Book § 23-42.[23] The petitioner, pro se, timely filed an appeal in this court.

---

[23] Practice Book § 23-42 provides: "(a) If the judicial authority finds that the case is wholly without merit, it shall allow counsel to withdraw and shall consider whether the petition shall be dismissed or allowed to proceed,

## IV

## CLAIMS ON APPEAL

In the argument section of his appellate brief, the petitioner states that the claims he raises are that (1) the habeas court failed to evaluate adequately whether the petition for a writ of habeas corpus was wholly frivolous and (2) the petition for a writ of habeas corpus is not wholly frivolous.[24] We disagree with the petitioner.

In part I, we agreed with the petitioner that the record was adequate for our review because all of the documents that were before the habeas court are available for our review.[25] In part II, we determined that the de novo standard of review is applicable to the petitioner's claims. We have reviewed the pro se petition for a writ of habeas corpus and all of the documents that were before the habeas court as well as that court's memorandum of decision. Our review has encompassed not only the claims of the petitioner, but also the arguments of the respondent.

with the petitioner pro se. If the petition is not dismissed, the judge ruling on the motion to withdraw as counsel shall not preside at any subsequent hearing on the merits of the case.

"(b) If the judicial authority concludes that the petition is not wholly without merit, it shall not allow counsel to withdraw and may direct counsel to proceed."

[24] In the statement of the issue in his brief, the petitioner stated that the issue was that "[t]he habeas court erred by granting the petitioner's motion for leave to withdraw appearance of appointed counsel and dismissing the petitioner's pro se petition for a writ of habeas corpus." Although the petitioner raised the latter issue in the habeas court by way of the request for reconsideration, to which the habeas court responded with a lengthy memorandum of decision as to the propriety of sua sponte dismissing the petition for a writ of habeas corpus, the petitioner has not briefed that issue on appeal. See footnote 2. We therefore consider the claim abandoned. See *Ziemba* v. *Commissioner of Correction*, supra, 90 Conn. App. 71.

[25] Except for the transcript of his plea canvass, the petitioner supplied the necessary documents as exhibits to his petition for a writ of habeas corpus.

We first consider the petitioner's claim that the habeas court failed to evaluate adequately whether the allegations of the petition for a writ of habeas corpus were without merit. In his petition for a writ of habeas corpus, the petitioner alleged that (1) he was denied the right to confront witnesses against him and to have compulsory process to obtain witnesses in his favor, (2) his guilty plea did not substantially comply with our rules of practice, (3) he was not advised of the immigration consequences of his guilty plea and (4) all of the foregoing were due to the ineffective assistance of trial counsel.

A

The respondent correctly notes that the petitioner's claims fall into two categories: those that allege a violation of the right to due process and those that allege the ineffective assistance of counsel. The respondent correctly points out that the petitioner could have raised his due process claims in the trial court by filing a motion to withdraw his guilty plea or in a direct appeal and that because he did not, in order to prevail in the habeas court, he must demonstrate good cause and prejudice to excuse the failure to raise them at trial or on direct appeal. See *Wainwright* v. *Sykes*, 433 U.S. 72, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977); *Jackson* v. *Commissioner of Correction*, 227 Conn. 124, 629 A.2d 413 (1993); *Johnson* v. *Commissioner of Correction*, 218 Conn. 403, 589 A.2d 1214 (1991). We agree with the respondent.

"The special problems regarding procedural defaults at trial that [our Supreme Court] noted in *Johnson* [v. *Commissioner of Correction*, supra, 218 Conn. 415] apply equally to procedural defaults on direct appeal, and militate in favor of our adoption of one standard by which to measure procedural defaults occurring at trial or on direct appeal. As the United States Supreme

Court has noted in specifically adopting the cause and prejudice standard to analyze procedural defaults on direct appeal: A State's procedural rules serve vital purposes at trial, on appeal, and on state collateral attack. . . . [Such rules] [afford] . . . the opportunity to resolve the issue shortly after trial, while evidence is still available both to assess the defendant's claim and to retry the defendant effectively if he prevails in his appeal. . . . This type of rule promotes not only the accuracy and efficiency of judicial decisions, but also the finality of those decisions, by forcing the defendant to litigate all of his claims together, as quickly after trial as the docket will allow, and while the attention of the appellate court is focused on his case." (Internal quotation marks omitted.) *Jackson* v. *Commissioner of Correction,* supra, 227 Conn. 133–34.

"[T]his court strongly disfavor[s] collateral attacks upon judgments because such belated litigation undermines the important principle of finality . . . . Therefore, we will review the claims only where the petitioner demonstrates good cause for the failure to preserve a claim at trial and actual prejudice resulting from the alleged constitutional violation. . . .

"Under this standard, the petitioner must demonstrate good cause for his failure to raise a claim at trial or on direct appeal and actual prejudice resulting from the impropriety claimed in the habeas petition. . . . Because [c]ause and prejudice must be established conjunctively, we may dispose of this claim if the petitioner fails to meet either prong." (Citations omitted; internal quotation marks omitted.) *Guadalupe* v. *Commissioner of Correction,* 68 Conn. App. 376, 385, 791 A.2d 640, cert. denied, 260 Conn. 913, 796 A.2d 557 (2002).

Our review of the record before the habeas court reveals that the petitioner did not file a motion to withdraw his guilty plea or file a direct appeal to raise his

due process claims. Those claims, therefore, would be subject to the defense of procedural default in the habeas proceedings.[26] See *Fernandez* v. *Commissioner of Correction*, 96 Conn. App. 251, 266, 900 A.2d 54, cert. denied, 280 Conn. 908, 907 A.2d 89 (2006). Fox filed the *Anders* motion before the respondent responded to the petition for a writ of habeas corpus. The habeas court did not address the issue of procedural default in its memorandum of decision. "Where no evidence [of cause and prejudice] has been provided, this court can independently conclude that the petitioner has failed to meet the cause and prejudice test." *Daniels* v. *Warden*, 28 Conn. App. 64, 72, 609 A.2d 1052, cert. denied, 223 Conn. 924, 614 A.2d 820 (1992).

1

The petitioner alleged that he was denied the right to confront witnesses against him and to call witnesses on his behalf. The habeas court determined that the petitioner waived the right to confront witnesses against him when he pleaded guilty.

"To prevail, the defendant must establish that the court failed to obtain a proper waiver of at least one of the three core constitutional rights identified in *Boykin* [v. *Alabama*, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969)]." *State* v. *Lugo*, 61 Conn. App. 855, 863, 767 A.2d 1250, cert. denied, 255 Conn. 955, 772 A.2d 153 (2001). "The United States Supreme Court has held that in order for the acceptance of a defendant's plea of guilty to comport with due process, the plea must be voluntarily and knowingly entered. . . . *Boykin* set forth three federal constitutional rights of which the

---

[26] Generally, a petitioner may raise a claim of ineffective assistance of counsel for the first time in a petition for a writ of habeas corpus and not violate the deliberate bypass rule. See *State* v. *Leecan*, 198 Conn. 517, 541–42, 504 A.2d 480, cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986).

defendant must be cognizant prior to entering a plea. . . . Third, is the right to confront one's accusers." (Citation omitted; internal quotation marks omitted.) *State* v. *Nelson*, 221 Conn. 635, 639, 605 A.2d 1381 (1992). "[A] defendant's literal right to confront the witnesses at the time of trial . . . forms the core of the values furthered by the Confrontation Clause." (Internal quotation marks omitted.) *State* v. *Strich*, 99 Conn. App. 611, 622, 915 A.2d 891, cert. denied, 282 Conn. 907, 920 A.2d 310 (2007).

In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous. *Falcon* v. *Commissioner of Correction*, 98 Conn. App. 356, 359, 908 A.2d 1130, cert. denied, 280 Conn. 948, 912 A.2d 480 (2006). Here, the habeas court had the opportunity to review the plea transcript, and the court determined that the plea was complete and adequate. Our review of the record reveals that the court's canvass was sufficient to establish that the petitioner's waiver was knowing and voluntary. See, e.g., *State* v. *Coleman*, 83 Conn. App. 672, 686–87, 851 A.2d 329, cert. denied, 271 Conn. 910, 859 A.2d 571 (2004), cert. denied, 544 U.S. 1050, 125 S. Ct. 2290, 161 L. Ed. 2d 1091 (2005).

Furthermore, the petitioner cannot demonstrate prejudice, as he confessed to the murder and agreed with the state's recitation of the underlying facts of the crime at the time of his plea. For the foregoing reasons, the petitioner's claim that he was denied the constitutional right to confront witnesses against him is frivolous.

2

The petitioner claims that he was denied due process because his guilty plea was not intelligent and voluntary in that the plea canvass did not conform to our rules of practice, he did not understand the questions that the trial court posed, Mastronardi coerced his answers,

and the court failed to advise him of the immigration consequences of his guilty plea. In his petition for a writ of habeas corpus, the petitioner alleged only that his guilty plea was made without substantial compliance with Practice Book §§ 39-19 and 39-20 and that he was not advised of the immigration consequences of his plea. We therefore decline to review the claims that the petitioner failed to understand the questions asked of him by the trial court and that Mastronardi coerced his responses.[27] This court does not review claims raised for the first time on appeal. See *Kelley* v. *Commissioner of Correction,* supra, 90 Conn. App. 335 (court not bound to consider claims unless record demonstrates question distinctly was raised and ruled on by court adversely to appellant).

Our Supreme Court has stated: "It is axiomatic that unless a plea of guilty is made knowingly and voluntarily, it has been obtained in violation of due process and is therefore voidable. . . . A plea of guilty is, in effect, a conviction, the equivalent of a guilty verdict by a jury. . . . [As noted in the United States Supreme Court's decision in *Boykin* v. *Alabama,* [supra, 395 U.S. 243, the defendant in] choosing to plead guilty . . . is waiving several constitutional rights, including his privilege against self-incrimination, his right to trial by jury, and his right to confront his accusers. . . . The *Boykin* constitutional essentials for the acceptance of a plea of guilty are included in our rules and are reflected in Practice Book §§ [39-19 and 39-20]. . . .

[27] Even if we were to conclude that the claims with respect to whether the petitioner understood the plea canvass and that Mastronardi had coerced his answers had been raised in the habeas court, the petitioner's claims would fail because they are not adequately briefed. The petitioner merely asserted those claims without explaining what he did not understand at the plea canvass and how Mastronardi coerced him. Without a clear explanation of what transpired, accompanied by legal authority to support his claims, we consider the petitioner's claims abandoned.

Those rules provide that the trial court must not accept a guilty plea without first addressing the defendant personally in open court and determining that the defendant fully understands the items enumerated in § 39-19, and that the plea is made voluntarily pursuant to § 39-20. . . . These considerations demand the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and its consequences. . . . We, therefore, require the trial court affirmatively to clarify on the record that the defendant's guilty plea was made intelligently and voluntarily." (Citation omitted; internal quotation marks omitted.) *State* v. *Fagan*, 280 Conn. 69, 90–92, 905 A.2d 1101 (2006), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007).

"In order for a plea to be valid, the record must affirmatively disclose that the defendant understands the nature of the charge upon which the plea is entered . . . the mandatory minimum sentence, if any . . . the fact that a statute does not permit the sentence to be suspended . . . the maximum possible sentence . . . and that the defendant has the right to plead not guilty or to persist in that plea if already made, the right to a trial by a jury or judge, the right to assistance of counsel, the right to confront the defendant's accusers and the right against compelled self-incrimination. . . . The record must further disclose that the plea is voluntary and not the result of threats or promises. . . . [I]t cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts. . . . An understanding of the law in relation to the facts must include all relevant information concerning the sentence." (Citation omitted; internal quotation marks omitted.) *Calabrese* v. *Commissioner of Correction*, 88 Conn. App. 144, 158–59, 868 A.2d 787, cert. denied, 273 Conn. 936, 875 A.2d 543 (2005).

The respondent notes that the petitioner did not move to withdraw his guilty plea prior to sentencing or file a direct appeal on the ground that his plea failed to comply with our rules of practice. "The validity of guilty pleas can be challenged before sentencing and on direct appeal." *Guadalupe* v. *Commissioner of Correction,* supra, 68 Conn. App. 384. "A defendant may withdraw his . . . plea of guilty . . . as a matter of right until the plea has been accepted. After acceptance, the judicial authority shall allow the defendant to withdraw his . . . plea upon proof of one of the grounds in Section 39-27. A defendant may not withdraw his . . . plea after the conclusion of the proceeding at which the sentence was imposed." Practice Book § 39-26.[28]

In his appellate brief, the petitioner failed to address the cause and prejudice standard to explain why he did not move to withdraw his plea before sentencing or file a direct appeal. In any event, the petitioner cannot demonstrate prejudice. The habeas court found that the trial court's canvass complied with Practice Book §§ 39-19 and 39-20 and that the trial court informed the petitioner of the immigration consequences of his guilty plea. On the basis of our plenary review of the transcript of the proceeding at which the petitioner pleaded guilty, we agree with the habeas court's conclusions that the petitioner's plea canvass conformed to our rules of practice and that the petitioner not only was made aware of the immigration consequences of his guilty plea, but

[28] Practice Book § 39-27 provides in relevant part: "The grounds for allowing the defendant to withdraw his . . . plea of guilty after acceptance are as follows:

"(1) The plea was accepted without substantial compliance with Section 39-19;

"(2) The plea was involuntary, or it was entered without knowledge of the nature of the charge or without knowledge that the sentence actually imposed could be imposed . . .

"(4) The plea resulted from the denial of effective assistance of counsel . . . ."

also that he unhesitatingly stated that he understood them all.[29]

B

The petitioner's third claim is that he was denied the effective assistance of counsel. In his petition for a writ of habeas corpus, the petitioner alleged that Mastronardi provided ineffective assistance by failing (1) to obtain information regarding the petitioner's childhood in Haiti, (2) to withdraw from the case so that the public defender's office could obtain costly medical and psychiatric evaluations, (3) to advise him correctly of the plea agreement, (4) to object to the presentence investigation and (5) to advise him of the immigration consequences of his guilty plea.[30] On appeal, the petitioner appears to have pursued only the claim that Mastronardi failed to obtain the medical and psychiatric

[29] There is nothing in the transcript of the plea proceeding that gives any indication that the petitioner did not understand the trial court's canvass. Furthermore, the trial court repeatedly asked the petitioner if he understood what was being said to him. In each instance, the petitioner responded that he understood. If the petitioner did not understand what was being asked of him, the time to speak up was when the court asked him if he understood, not now in a habeas appeal. See *State* v. *Winer*, 69 Conn. App. 738, 750, 796 A.2d 491 ("A swift change of heart is itself strong indication that the plea was entered in haste and confusion. . . . A period of fourteen months can hardly be considered a swift change of heart. Such a substantial delay in time between the defendant's sentencing and his challenge of the sentence's validity tends to reveal that the defendant expected a term of probation when he was sentenced." [Citation omitted; internal quotation marks omitted.]), cert. denied, 261 Conn. 909, 806 A.2d 50 (2002). Here, there was a delay of about seven and one-half months between the time the petitioner pleaded guilty and the time he filed his petition for a writ of habeas corpus.

[30] In his brief on appeal, the petitioner claimed that in addition to the allegations of ineffective assistance of counsel pleaded in the petition for a writ of habeas corpus, the following potential claims existed: Mastronardi rendered ineffective assistance of counsel by failing (1) to investigate the defenses of extreme emotional disturbance and justified use of physical force, (2) to pursue a manslaughter conviction because the petitioner lacked the intent necessary to be convicted of murder and (3) to advise the petitioner that a conviction for murder makes him ineligible for parole. We decline to review those claims raised by the petitioner for the first time on appeal. See *Kelley* v. *Commissioner of Correction*, supra, 90 Conn. App. 335.

evaluations that Selig mentioned. The habeas court did not address the issue of a more extensive psychiatric evaluation in its memorandum of decision, and the petitioner failed to file a motion for articulation. See Practice Book § 61-10. Although the petitioner did barely more than mention the medical and psychiatric evaluations in his brief, the state has addressed the issue in its brief. We will address the issue because it presents a question of law, and the record on appeal before us is the same as the one before the habeas court. See *Christopher R.* v. *Commissioner of Mental Retardation*, 277 Conn. 594, 612 n.18, 893 A.2d 431 (2006).

"A criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. *Strickland* v. *Washington*, supra, 446 U.S. 686. This right arises under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. *Baez* v. *Commissioner of Correction*, 34 Conn. App. 236, 242–43, 641 A.2d 147, cert. denied, 231 Conn. [905, 906], 648 A.2d [149] (1994). Pretrial negotiations implicating the decision of whether to plead guilty is a critical stage in criminal proceedings; *Colson* v. *Smith*, 438 F.2d 1075, 1078 (5th Cir. 1971); and plea bargaining is an integral component of the criminal justice system and essential to the expeditions and fair administration of our courts. *Blackledge* v. *Allison*, 431 U.S. 63, 71, 97 S. Ct. 1621, 52 L. Ed. 2d 136 (1977); see *Statewide Grievance Committee* v. *Whitney*, 227 Conn. 829, 842, 633 A.2d 296 (1993). [Plea bargaining] leads to prompt and largely final disposition of most criminal cases; it avoids much of the corrosive

Furthermore, the record provided by the petitioner demonstrates that he did not give Hankins authority to accept a plea agreement for manslaughter. The prosecutor informed the trial court and Mastronardi during a pretrial conference that he was being pressured by Bernadel's family to request a substantial sentence and, for that reason, was unwilling to reduce the murder charge against the petitioner to manslaughter.

impact of enforced idleness during pretrial confinement for those who are denied release pending trial; it protects the public from those accused persons who are prone to continue criminal conduct even while on pretrial release; and, by shortening the time between charge and disposition, it enhances whatever may be the rehabilitation prospects of the guilty when they are ultimately imprisoned." (Internal quotation marks omitted.) *Copas* v. *Commissioner of Correction*, supra, 234 Conn. 153–54.

"In *Strickland* v. *Washington*, supra, 466 U.S. 668, the United States Supreme Court adopted a two-part standard for evaluating claims of ineffective assistance of counsel during criminal proceedings: the defendant must show: (1) that counsel's representation fell below an objective standard of reasonableness; id., 687–88; and (2) that defense counsel's deficient performance prejudiced the defense. Id., 694." *Copas* v. *Commissioner of Correction*, supra, 234 Conn. 154. "In *Hill* v. *Lockhart*, supra, 474 U.S. 57–58, the court determined that the same two-part standard applies to claims arising from the plea negotiation process and that the same justifications for imposing the prejudice requirement in *Strickland* were relevant in the context of guilty pleas. Although the first half of the *Strickland* test remains the same for determining ineffective assistance of counsel at the plea negotiation stage, the court modified the prejudice standard. As in *Strickland*, the prejudice standard for plea negotiations is intended to determine whether, but for counsel's constitutionally deficient performance, the outcome of the plea process would have been different." *Copas* v. *Commissioner of Correction*, supra, 156.

"To satisfy the performance prong, the petitioner must show that counsel's representation fell below an objective standard of reasonableness. . . . A petitioner who accepts counsel's advice to plead guilty has

the burden of demonstrating on habeas appeal that the advice was not within the range of competence demanded of attorneys in criminal cases. . . . The range of competence demanded is reasonably competent, or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . Reasonably competent attorneys may advise their clients to plead guilty even if defenses may exist. . . . A reviewing court must view counsel's conduct with a strong presumption that it falls within the wide range of reasonable professional assistance and that a tactic that appears ineffective in hindsight may have been sound trial strategy at the time. . . .

"To satisfy the prejudice prong, the petitioner must show a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. . . . Reasonable probability does not require the petitioner to show that counsel's deficient conduct more likely than not altered the outcome in the case, but he must establish a probability sufficient to undermine confidence in the outcome. . . . A reviewing court can find against a petitioner on either ground, whichever is easier." (Internal quotation marks omitted.) *Bowden* v. *Commissioner of Correction*, 93 Conn. App. 333, 339, 888 A.2d 1131, cert. denied, 277 Conn. 924, 895 A.2d 796 (2006).

On the basis of our review of the correspondence from Selig to Mastronardi, we conclude that Mastronardi did not provide ineffective assistance of counsel by failing to pursue additional medical and psychiatric evaluations that were not likely to produce evidence of the petitioner's being brain damaged. Mastronardi suggested that the petitioner undergo a psychiatric evaluation by Selig to pursue a possible defense of extreme emotional disturbance. Following his interview of the petitioner and review of the documents sent to him, Selig informed Mastronardi that the petitioner "would

have a very hard time sustaining a defense of extreme emotional disturbance." Selig also stated that the petitioner's "history of explosive disorders *may be* related to brain damage which could be more fully explored with psychological testing, neuropsychological testing, an EEG of his brain, and an MRI of his brain." (Emphasis in original.) Selig concluded, however, "that after we got through with all of that testing, there is a low likelihood that we would find evidence of brain damage." Moreover, the petitioner's family, which was financing his defense, declined to pay for the testing and evaluations.

It is to Mastronardi's credit that he turned to an expert in the field of psychiatry to pursue the defense of extreme emotional disturbance. Having sought Selig's advice, it was reasonable for Mastronardi to rely on it. Selig emphasized that he thought that there was a "low likelihood" that the testing would reveal brain damage. Selig found no significant cognitive problems in the petitioner during the interview. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland* v. *Washington,* supra, 466 U.S. 691. The petitioner failed to allege any facts in his petition for a writ of habeas corpus or in his objection to the *Anders* motion to demonstrate that Mastronardi's decision was unreasonable. In raising this claim on appeal, the petitioner has done little more than speculate.

Furthermore, the petitioner has not met his heavy burden to demonstrate that he was prejudiced by Mastronardi's tactical decision. At the time, the petitioner's family was financing his defense. His family was unable or refused to pay for the testing suggested by Selig. The

petitioner argued that, at that time, Mastronardi should have withdrawn from the case and returned it to the public defender's office to obtain the expensive testing. The petitioner has failed to persuade us that, under the circumstances, the public defender's office would have taken the case or that the state would have paid for the testing. At the time the petitioner pleaded guilty, the trial court told him what the maximum and minimum sentences were that could be imposed. The court also stated the terms of the plea agreement, and the petitioner told the court that he understood the terms of the agreement and that no other promises had been made to him. The petitioner, therefore, has failed to demonstrate that he would not have pleaded guilty but for Mastronardi's alleged ineffective assistance.

C

The petitioner's final claim is that the habeas court improperly concluded that the petition for a writ of habeas corpus, on the basis of ineffective assistance of trial counsel, was wholly frivolous. On the basis of our thorough review, in accord with the *Anders* standard, of the petition, the attached exhibits, the plea canvass, the habeas court's memorandum of decision and the briefs of the parties on appeal, we conclude that the petition for a writ of habeas corpus was wholly frivolous.

There is no merit to the petitioner's claims that the trial court's plea canvass failed to conform to our rules of practice and that the trial court failed to apprise him of the immigration consequences of his guilty plea. The trial court found that the petitioner's plea was intelligent and voluntary, and, therefore, the habeas court properly concluded that the petitioner waived his right to confront the witnesses against him. If Mastronardi initially told the petitioner that the plea agreement was for

twenty-five years, whether or not Mastronardi subsequently corrected his mistake, during the plea canvass, the trial court queried the petitioner at length as to whether he understood the terms of the plea agreement as to the parameters of the sentence he could expect and asked him if anyone had promised him anything else. Despite the allegation in his appellate brief that he did not understand some of the questions the trial court asked him, the petitioner never told the habeas court or this court which questions he did not understand or how Mastronardi allegedly coerced him to answer them.

The petitioner also alleged that Mastronardi failed to object to the presentence investigation report. The petitioner claims that there was no investigation to determine whether he was the product of a stable upbringing in Haiti, but he does not deny that he was interviewed as part of the investigation process and that he discussed his childhood with the interviewer. As to the statement in the presentence investigation report that the petitioner did not express remorse for the victim, the petitioner was given an opportunity at the time of sentencing to express his remorse in open court in front of Bernadel's family, which he did.

Moreover, even if we were to find evidence of ineffective assistance of counsel, which we do not, we cannot conclude that the outcome would have been different. The petitioner overheard Bernadel arguing with the petitioner's parents outside of his home. The petitioner took a kitchen knife and intervened in the situation. The petitioner then left the premises, but returned and saw Bernadel arguing with the petitioner's mother. The petitioner exited his motor vehicle, and chased Bernadel and stabbed him when Bernadel tripped. Shortly thereafter, the petitioner turned himself into the police and confessed. Although Hankins had discussed with

the state a plea agreement to the crime of manslaughter, the petitioner never authorized her to accept the offer. Later, Mastronardi was unable to negotiate a plea agreement with the state because Bernadel's parents wanted nothing less than a murder charge. On the basis of the facts to which the petitioner confessed, there is a reasonable probability that a jury would have found the petitioner guilty of murder, and it is likely that he would have received a sentence in excess of twenty-seven years.[31] Also, the petitioner has not demonstrated that he would not have pleaded guilty, but for counsel's alleged errors.

Finally, we address the petitioner's claim that the habeas court failed to discern potential claims not revealed by the petition for a writ of habeas corpus. As we stated at the start of this opinion, the petition for a writ of habeas corpus is a pleading. The petitioner had the burden to bring to the attention of the court factual allegations showing that he was deprived of his constitutional rights.

On the basis of our de novo review, which included a plenary review of the petition for a writ of habeas corpus, an examination of the record, including the *Anders* motion and the habeas court's memorandum of decision, as well as the application of the controlling legal standards, we conclude that the habeas court's judgment should be affirmed.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[31] As to the petitioner's Haitian background, the petitioner has failed to explain how it would have affected the outcome at trial or his sentence.