DANA MOZELL *v.* COMMISSIONER OF CORRECTION
(SC 18196)

Rogers, C. J., and Norcott, Katz, Vertefeuille and Schaller, Js.

Argued October 22, 2008—officially released April 14, 2009

*Deren Manasevit,* special public defender, for the appellant (petitioner).

*Marjorie Allen Dauster,* senior assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Linda Howe,* senior assistant state's attorney, for the appellee (respondent).

*Opinion*

SCHALLER, J. Following a second habeas corpus trial, the petitioner, Dana Mozell, appeals[1] from the judgment of the habeas court denying his amended petition for a writ of habeas corpus. On appeal, the petitioner claims that: (1) he was denied due process of law when the first habeas court declared a mistrial after receiving most of the evidence; (2) he was denied due process of law when the second habeas court denied his petition based, in part, on its reliance on the transcripts from the petitioner's first habeas corpus trial to which both parties had stipulated; (3) he received ineffective assistance of counsel because his trial counsel failed to present two exculpatory witnesses; (4) the second habeas court improperly failed to consider all of the evidence in denying the petitioner's claim of actual innocence; and (5) he was denied due process of law as a result of numerous delays during the proceedings concerning his petitions for habeas relief. We affirm the judgment of the habeas court.

---

[1] The petitioner appealed from the judgment of the habeas court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

The opinion of the Appellate Court from the petitioner's direct appeal of his criminal conviction sets forth the following facts that the jury reasonably could have found. "The [petitioner] was a member of a gang that sold illegal narcotics in New Haven. For several weeks preceding the death of the victim, Richard Coleman, the [petitioner's] gang was involved in a dispute with Shelton Tucker, Sean Green and Rodney Lewis over control of the drug trade on Arthur Street. On December 29, 1989, at approximately 6:30 p.m., several members of the [petitioner's] gang, including the [petitioner], his brother Troy Mozell, Eric Morton, Ronald Douglas and Matthew Bowden arrived at Arthur Street in a gray Jeep Cherokee. Meanwhile, Tucker and Lewis were walking across Arthur Street toward Tucker's residence at 2 Arthur Street. The victim, a bystander, was walking past Tucker's residence.

"As Tucker and Lewis crossed Arthur Street, the [petitioner], together with Morton and Bowden, exited the Jeep carrying handguns. Tucker and Lewis noticed the vehicle and the gunmen and began to run toward Tucker's residence. The trio chased Tucker and Lewis and simultaneously fired their weapons at them several times. To avoid the gunshots, Tucker and Lewis hid behind a vehicle that was parked in front of Tucker's house. When the shooting ceased, Tucker and Lewis saw that the victim was lying on the sidewalk in front of 6 Arthur Street. The victim was struck in the chest by a single nine millimeter bullet and died later that evening.

"Tucker and Lewis informed Detective Samuel Cotto of the New Haven police department that Troy Mozell and other members of the [petitioner's] gang were responsible for the shooting. Lewis specifically named Robert Henderson and Douglas, and described a third participant as 'a kid in a green jacket.' The New Haven police obtained search warrants for Henderson's apart-

ment at 288 Front Street, the [petitioner's] apartment at 16 Peck Street and the gray Jeep Cherokee that was owned by the [petitioner's] mother, Alice Mozell. The police recovered two loaded nine millimeter ammunition clips from Henderson's apartment, six live nine millimeter cartridges from the [petitioner's] apartment, and a green jacket from inside the Jeep.

"The police initially arrested only Troy Mozell and Douglas. At a probable cause hearing on February 27, 1990, Tucker was called to testify. While testifying, Tucker saw the [petitioner] sitting in the courtroom gallery among several other spectators and recognized him as one of the shooters. Tucker's identification of the [petitioner] led police to investigate further and resulted in the [petitioner's] arrest." *State* v. *Mozell*, 40 Conn. App. 47, 49–50, 668 A.2d 1340, cert. denied, 236 Conn. 910, 671 A.2d 824 (1996).

The record reveals the following additional undisputed facts and procedural history. After the jury trial, the petitioner was convicted of conspiracy to commit murder in violation of General Statutes §§ 53a-54a (a) and 53a-48 (a), and manslaughter in the second degree as an accessory in violation of General Statutes §§ 53a-56 (a) (1) and 53a-8 (a). Thereafter, the petitioner filed a direct appeal from the judgment of conviction, and the Appellate Court affirmed the judgment of the trial court. Id., 49.

On May 10, 2001, the petitioner filed a second amended petition for a writ of habeas corpus. The first habeas court, *Levine, J.*, began trial on the petition on October 10, 2001. On September 17, 2002, that court declared a mistrial, giving no reason for its decision and, subsequently, denied the petitioner's motion for reconsideration. On April 13, 2005, the petitioner filed an amended petition for a writ of habeas corpus. A second habeas hearing commenced on September 12,

2006, and on January 24, 2007, the habeas court, *Hon. Anthony V. DeMayo*, judge trial referee, denied the petition for habeas corpus. Thereafter, on February 5, 2007, that court granted the petitioner's petition for certification to appeal.

I

The petitioner first claims that he was deprived of his right to due process under the fifth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution in his first habeas trial when, after having heard testimony from all but two witnesses, the habeas court declared a mistrial. Specifically, the petitioner argues that, because there was no legitimate reason for the declaration of a mistrial, the habeas court's order declaring a mistrial was arbitrary and, therefore, constituted an abuse of discretion. The respondent, the commissioner of correction, first contends that the petitioner's claim is moot because the petitioner subsequently received a second habeas trial and, therefore, this court cannot grant the petitioner any practical relief. In the alternative, the respondent argues that the petitioner's claim must fail because the record is inadequate for review. Because the petitioner did not raise his claim at trial, he seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989),[2] and the plain error doctrine. Practice Book § 60-5. We conclude that this claim is inadequately briefed for our review.

We first address the respondent's argument that the petitioner's claim is moot because he received a second habeas trial and, therefore, he cannot receive any practi-

---

[2] The respondent argues that *Golding* review is inapplicable in all circumstances that arise from an appeal from the judgment of a habeas court. We disagree. Inasmuch as the petitioner challenges the actions of the habeas court itself, we conclude that *Golding* review is applicable. See, e.g., *Lebron* v. *Commissioner of Correction*, 274 Conn. 507, 531–32, 876 A.2d 1178 (2005).

cal relief in this appeal. "It is axiomatic that when events have occurred that preclude an appellate court from granting any practical relief through a disposition on the merits, the case is moot and must be dismissed for lack of subject matter jurisdiction." *Blesso Fire Systems, Inc.* v. *Eastern Connecticut State University*, 245 Conn. 252, 256, 713 A.2d 1283 (1998); *In re Romance M.*, 229 Conn. 345, 357, 641 A.2d 378 (1994). In the present case, however, the petitioner claims that the mistrial declared in his first habeas trial affected the fairness of his second habeas trial because the second habeas court relied, in part, on transcripts from the first habeas trial in rendering its decision. Therefore, if the petitioner can prevail on his claims regarding the second habeas court's reliance on the transcripts from the first habeas trial, he can receive practical relief in the form of a new habeas trial. Accordingly, we conclude that the petitioner's claim is not moot.

Turning to the merits of petitioner's claim, we begin by setting forth our well settled standard of review. "While the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome. . . . The trial court is better positioned than we are to evaluate in the first instance whether a certain occurrence is prejudicial to the defendant and, if so, what remedy is necessary to cure that prejudice. . . . The decision whether to grant a mistrial is within the sound discre-

tion of the trial court." (Internal quotation marks omitted.) *State* v. *Higgins*, 265 Conn. 35, 75–76, 826 A.2d 1126 (2003).

Under *Golding,* a party "can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the [petitioner] of a fair trial; and (4) if subject to harmless error analysis, the [respondent] has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." *State* v. *Golding,* supra, 213 Conn. 239–40. In the present case, the first habeas court's order stated: "The court hereby declares a mistrial in the above referenced matter," without providing any further explanation for its actions. Because the petitioner failed to move for an articulation of the habeas court's declaration, the record is inadequate for review. Accordingly, we decline to review the petitioner's claim.[3]

## II

The petitioner next claims that he was denied his right to due process under the fifth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution when the second habeas court, in denying his amended petition for a writ of habeas corpus, relied, in part, on the transcribed testimony from the petitioner's first habeas hearing. Although the petitioner acknowledges that both parties stipulated to the second habeas court's

[3] Because the record is inadequate for review under *Golding,* it is also inadequate for consideration under the plain error doctrine. See *Lorthe* v. *Commissioner of Correction,* 103 Conn. App. 662, 668 n.4, 931 A.2d 348, cert. denied, 284 Conn. 939, 937 A.2d 696 (2007).

reliance on that testimony, the petitioner nonetheless argues that: (1) the stipulation was inadequate; and (2) his waiver of his right to a new trial was not given knowingly and voluntarily. The petitioner claims, therefore, that he is entitled to a new trial. In response, the respondent argues that the habeas court's reliance was proper in light of the petitioner's waiver of his right to a new trial. Because the petitioner did not raise his claim at trial, he seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40, and the plain error doctrine. Practice Book § 60-5. We conclude that the petitioner effectively waived this claim.

At the outset, we recognize that, when a right has been affirmatively waived at trial, we generally do not afford review under either *Golding* or the plain error doctrine. In *State* v. *Fabricatore*, 281 Conn. 469, 482, 915 A.2d 872 (2007), we concluded that "unpreserved, waived claims, fail under the third prong of *Golding* . . . ."[4] Similarly, we agree with the decisions of the Appellate Court that, "[j]ust as a valid waiver calls into question the existence of a constitutional violation depriving the defendant of a fair trial for the purpose of *Golding* review, a valid waiver also thwarts plain error review of a claim." *State* v. *Corona*, 69 Conn. App. 267, 274, 794 A.2d 565, cert. denied, 260 Conn. 935, 802 A.2d 88 (2002). "[The] [p]lain [e]rror [r]ule may only be invoked in instances of forfeited-but-reversible error . . . and cannot be used for the purpose of revoking an otherwise valid waiver. This is so because if there has been a valid waiver, there is no error for us to correct. . . . The distinction between a forfeiture of a right (to which the [p]lain [e]rror [r]ule may be applied) and a waiver of that right (to which the [p]lain [e]rror

---

[4] In *State* v. *Golding*, supra, 213 Conn. 240, we stated that "[i]n the absence of any one of these conditions, the [petitioner's] claim will fail. The appellate tribunal is free, therefore, to respond to the [petitioner's] claim by focusing on whichever condition is most relevant in the particular circumstances."

[r]ule cannot be applied) is that [w]hereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." (Internal quotation marks omitted.) Id., 274–75; see also *State* v. *Wilson*, 52 Conn. App. 802, 809–10, 729 A.2d 778 (1999). On the basis of the record from the second habeas hearing, we decline to review the petitioner's claim under either *Golding* or the plain error doctrine because we conclude that the petitioner waived his claim.

"It is well settled that a criminal defendant may waive rights guaranteed to him under the constitution. [*State* v. *Fabricatore*, supra, 281 Conn. 478]. The mechanism by which a right may be waived, however, varies according to the right at stake. *State* v. *Gore*, 288 Conn. 770, 778, 955 A.2d 1 (2008). For certain fundamental rights, the defendant must personally make an informed waiver. . . . For other rights, however, waiver may be effected by action of counsel. . . . *New York* v. *Hill*, 528 U.S. 110, 114, 120 S. Ct. 659, 145 L. Ed. 2d 560 (2000); see also *Gonzalez* v. *United States*, 553 U.S. 242, 247–48, 128 S. Ct. 1765, 170 L. Ed. 2d 616 (2008)." (Internal quotation marks omitted.) *State* v. *Smith*, 289 Conn. 598, 620, 960 A.2d 993 (2008). "When a party consents to or expresses satisfaction with an issue at trial, claims arising from that issue are deemed waived and may not be reviewed on appeal. See, e.g., *State* v. *Holness*, 289 Conn. 535, 544–45, 958 A.2d 754 (2008) (holding that defendant waived [claim under *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), that trial court improperly admitted recording of conversation in violation of confrontation clause of federal constitution] when counsel agreed to limiting instruction regarding hearsay statements introduced by state on cross-examination); *State* v. *Fabricatore*, supra, [481] (concluding defendant waived claim when he not only failed to object to jury instruction

but also expressed satisfaction with it and argued that it was proper)." *State* v. *Smith*, supra, 621.

In the present case, both the petitioner and his counsel affirmatively agreed to have the second habeas court render a decision, in part, on the basis of the former testimony adduced at the first habeas trial, stipulating to their agreement at the beginning of the second habeas trial.[5] At that time, and in the presence of the petitioner, the respondent asserted that the petitioner's three primary habeas witnesses, Henderson, Tucker and Thomas Sanders, were all still living in the community and subject to subpoena. Thereafter, the respondent requested that the habeas court canvass the petitioner and ascertain his waiver of his right to have the witnesses recalled. Prior to the court's canvass, the petitioner's attorney stated that he had explained "the pluses and the serious minuses" of recalling the witnesses, including the concern that any subsequent testimony could be impeached by the witnesses' former testimony from the first habeas trial, and that this was a "[m]ajor risk." Thereafter, the habeas court canvassed the petitioner as follows:

"The Court: But . . . I want you [the petitioner] to . . . indicate to me whether you are in agreement with your counsel's position, namely, that I will take the transcripts of the mistrial and all that testimony that came in in that case plus what we hear today. And that—and then decide if on the basis of that, eliminating the need for starting the case all over again, and bringing those people back, and bringing you back as well.

---

[5] The second habeas trial began with the following colloquy between the court and the petitioner's counsel:

"The Court: And counsel, do you have a statement of agreement for the record in this matter?

"[The Petitioner's Counsel]: Yeah. Yes, Your Honor. It's from my understanding from the last time this matter that, ah—the previous testimony was . . . stipulated. Ah, so that the petitioner would not have to recall all these additional witnesses . . . ."

"And as counsel points out, any time a person's called back to testify, his previous testimony is available in that transcript, and he can be cross-examined on any inconsistencies. And that's one of his reasons for preferring this route. And I just want to be sure that you concur in that decision?

"[The Petitioner]: Yes.

"The Court: You do?

"[The Petitioner]: Yeah. I don't—

"The Court: Okay. You—

"[The Petitioner]: I don't have a problem with it."

Under the circumstances of the present case, it is clear that the petitioner has waived his claims that his stipulation to the use of the transcribed testimony was inadequate and that his waiver of his right to a new trial was not given voluntarily. The record reveals that the petitioner's decision to stipulate to the court's use of the transcribed testimony, thereby waiving his right to a new habeas trial, was not only voluntary and knowing, but also intentional and strategic. "To allow the [petitioner] to seek reversal now that his trial strategy has failed would amount to allowing him to induce potentially harmful error, and then ambush the state with that claim on appeal." (Internal quotation marks omitted.) *State* v. *Fabricatore*, supra, 281 Conn. 480–81. Accordingly, because the petitioner waived his claim, we decline review under *Golding* and the plain error doctrine.

## III

The petitioner's third claim on appeal is that the second habeas court improperly rejected his claim that he had received ineffective assistance of counsel in his criminal trial in violation of the sixth and fourteenth amendments to the United States constitution and arti-

cle first, § 8, of the Connecticut constitution because his trial counsel, Thomas Farver, failed to present two allegedly exculpatory witnesses, namely, Henderson and Sanders. The petitioner contends that Henderson's testimony would have rebutted that of the state's only witness to testify to having heard the petitioner confess to the shooting, and that Sanders, an alleged eyewitness to the shooting, would have testified that the petitioner was not one of the gunmen. The respondent counters that the second habeas court properly denied the petition because the decision not to present the testimony of Henderson and Sanders was a reasonable tactical decision in light of: (1) the theory of the defense, which implicated Henderson; and (2) the substantial opportunities that the state would have had to impeach both Henderson and Sanders, given both the inconsistencies in their statements and their affiliation with the Island Brothers gang, of which the petitioner was a member. We agree with the respondent.

The following summary of the testimony presented at both the petitioner's criminal trial and the first habeas trial is relevant to the petitioner's claims. At the petitioner's criminal trial, Douglas, a member of the Island Brothers gang, testified that, after the shooting had occurred, the petitioner and Bowden, another gang member, entered Henderson's apartment, where Henderson and others were playing cards. Douglas testified that, upon hearing that someone had been killed in the shootout, the petitioner and Bowden began arguing over who had fired the fatal shot. Douglas also testified that Daryl Jackson was among those present during this "confession." To rebut Douglas' testimony, Farver called Jackson and Bowden. According to Farver's offer of proof, Jackson would testify that he was not at Henderson's apartment on the night in question and that he did not hear any such conversation. Because Jackson was recovering from an unrelated gunshot wound at

the time of the petitioner's criminal trial, however, Farver filed a motion for a continuance. The trial court denied the motion for a continuance, which the petitioner unsuccessfully challenged on appeal. *State* v. *Mozell*, supra, 40 Conn. App. 52–55. Farver did call Bowden, who testified that he had gone to the scene of the shooting on Arthur Street, accompanied by only Douglas and Morton. He also testified that he never went to Henderson's apartment after the shooting and, accordingly, did not see the petitioner there.

Both Henderson and Sanders testified at the petitioner's first habeas trial. Henderson testified that he was present at his apartment after the shooting, and that the petitioner was not there and had never confessed to the crime. Henderson also testified that he was the leader of the Island Brothers gang at the time of the shooting, knew that he was a suspect in this case and that he had other charges pending against him at the time of the petitioner's criminal trial. When asked what he would have said if he had been called as a witness at the petitioner's criminal trial, Henderson responded, "I don't know."

Sanders testified at the first habeas trial that he was an eyewitness to the shooting and that the petitioner was not among those involved. Sanders testified that he had seen Morton and Douglas on Arthur Street moments prior to the shooting. Moreover, although Sanders initially denied ever having given a statement to police regarding the incident, he later admitted to having provided the police with a statement when counsel confronted him with a transcript and an audiotape recording of his statement. In that statement, Sanders indicated that he had observed Tucker and Lewis approach his position and that, based on a prior incident with the two men, Sanders believed the two men were about to fire shots at him. Accordingly, he testified that he took cover and, as a result, did not actually witness

the shooting. Sanders also testified that he was currently serving a sentence for a felony conviction. Finally, when asked what he would have testified to at the time of the petitioner's criminal trial, Sanders responded, "I just told you that I am not sure. I don't know." Later, he added, "I don't know if I would have cooperated back then. I don't know if I would have said that I was a witness."[6]

During the second habeas trial, Farver testified as to why he did not call either Henderson or Sanders. With respect to Henderson, Farver stated that: (1) the petitioner, who was a good friend of Henderson, informed him that Henderson would not cooperate; (2) the attorney who was representing Henderson on another charge told him that Henderson would not cooperate; and (3) the defense might benefit from attempting to implicate Henderson as the offender because he had a motive.[7] With respect to Sanders, Farver testified that, after reading Sanders' statement to police, he concluded that Sanders was not a witness to the actual shooting. Moreover, Farver testified that the petitioner had informed him that, at the time of trial, Sanders was a fugitive from justice.[8]

We begin with the applicable standard of review and the law governing ineffective assistance of counsel claims. "The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . .

[6] Indeed, the record reflects that Sanders attempted to walk a fine line in his testimony concerning what he had witnessed. In an exchange with the court, Sanders stated, "[i]f you are asking me if [the petitioner] was the person at the crime of the shooting, I would have told you no. If you are asking me, was I a witness to the murder, I would say no."

[7] The events that preceded the shootout consisted of an altercation regarding drug turf between Tucker and Lewis, and Sanders, who is Henderson's half brother.

[8] It later turned out that at the time of petitioner's trial, Sanders was in the custody of the department of correction.

The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Internal quotation marks omitted.) *Sastrom* v. *Mullaney*, 286 Conn. 655, 661, 945 A.2d 442 (2008).

"A criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. *Strickland* v. *Washington*, [466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]. This right arises under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. *Copas* v. *Commissioner of Correction*, 234 Conn. 139, 153, 662 A.2d 718 (1995). . . . It is axiomatic that the right to counsel is the right to the effective assistance of counsel. . . . A claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. To satisfy the performance prong . . . the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . *Ledbetter* v. *Commissioner of Correction*, 275 Conn. 451, 460, 880 A.2d 160 (2005), cert. denied sub nom. *Ledbetter* v. *Lantz*, 546 U.S. 1187, 126 S. Ct. 1368, 164 L. Ed. 2d 77 (2006). . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . The claim will succeed only if both prongs are satisfied." (Citations omitted; internal quotation marks omitted.) *Sastrom* v. *Mullaney*, supra, 286 Conn. 661–62.

In denying the petition, the second habeas court concluded that Farver's performance was not deficient, specifically finding that Farver had been "prepared for

trial, [had] conducted a vigorous defense of a weak case and [had] performed throughout at a high level." In support of its conclusions, the habeas court stated that the testimony of Henderson and Sanders would not have added anything to the petitioner's trial and, in fact, would have done more harm than good. Specifically, the habeas court noted that the testimony of Henderson and Sanders was inconsistent: Henderson stated that Morton was one of the three gunmen who had come to his apartment after the shooting, whereas Sanders testified that Morton was not one of the shooters. Moreover, the habeas court noted that, by the time Henderson and Sanders had testified at the habeas trial, it was convenient to inculpate Douglas, Bowden and Morton, all of whom already had pleaded guilty to offenses stemming from the shooting. Additionally, with respect to Henderson, the habeas court found that: (1) Farver had been informed, both by the petitioner and by Henderson's attorney, that Henderson would not have cooperated; (2) Henderson was the leader of a drug dealing gang; (3) Henderson had a felony record; (4) Henderson knew the petitioner had been charged with the murder but never had come forward to police; and (5) it was unclear whether, if called, Henderson would even have testified. With respect to Sanders, the habeas court found that Sanders' testimony was considerably undermined by his denial of having given a prior statement to the police, until an audiotaped statement was played and he subsequently admitted to having made the statement. The second habeas court found that Sanders' habeas testimony also contradicted his statement to the police. In the statement, Sanders stated that he did not witness the shooting, but at the hearing, he testified that he had witnessed the shooting from start to finish. Moreover, Sanders had a felony record. In short, the second habeas court found the testimony of both Henderson and Sanders to be "contrived and not credible."

On the basis of the record before us from both the petitioner's first and second habeas hearings, it is clear that Farver's performance did not fall below an objective standard of reasonableness. "As a general rule, a habeas petitioner will be able to demonstrate that trial counsel's decisions were objectively unreasonable only if there [was] no . . . tactical justification for the course taken." (Internal quotation marks omitted.) *Lynn* v. *Bliden*, 443 F.3d 238, 247 (2d Cir. 2006), cert. denied, 549 U.S. 1257, 127 S. Ct. 1383, 167 L. Ed. 2d 168 (2007); see also *Strickland* v. *Washington,* supra, 466 U.S. 689 (petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy" [internal quotation marks omitted]); *Eze* v. *Senkowski*, 321 F.3d 110, 129 (2d Cir. 2003) ("the decision not to call a witness must be grounded in some strategy that advances the client's interests"). In the present case, Farver's decision not to call either Henderson or Sanders was well within the realm of sound trial strategy. Farver vigorously opposed the admission of evidence relating to gang membership and gang activity. *State* v. *Mozell,* supra, 40 Conn. App. 50–52. The decision not to call Henderson, the former leader of the gang, and Sanders, whose gang affiliated drug dealing activities were presented as the motivation for the shooting, was entirely consistent with the theory of defense to exclude mention of gang involvement. Moreover, Farver intended to "point a finger" at Henderson, who, as Sanders' half brother, had an apparent motivation to commit the crime. Farver concluded that it would have been unwise to ask a jury to believe Henderson's testimony while simultaneously asking the jury to believe that Henderson was a guilty party. In addition, as the habeas court's findings reveal, Henderson and Sanders' testimony likely would have done more harm than good, as both were gang members with felony records, and their sto-

ries were inconsistent as to the identity of the shooters. Accordingly, we conclude that the habeas court properly determined that the petitioner had failed to establish that Farver's performance fell below an objective standard of reasonableness.

## IV

The petitioner next claims that the second habeas court improperly rejected his claim of actual innocence because it failed to consider all of the evidence, namely, the recanted testimony of Tucker, the witness who initially had identified the petitioner as one of the shooters. In support of his claim, the petitioner notes that: (1) there was confusion as to whether Tucker's testimony was included in the transcripts provided to the habeas court; (2) the habeas court failed to mention the recantation in its memorandum of decision; and (3) in its memorandum of decision the habeas court referred to the testimony of Henderson and Sanders as the only newly discovered evidence. The respondent argues that the petitioner failed to establish that the habeas court did not consider Tucker's testimony. We agree with the respondent.

"In *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 747, 700 A.2d 1108 (1997), this court held that the proper standard for evaluating a freestanding claim of actual innocence, like that of the petitioner, is twofold. First, the petitioner must establish by clear and convincing evidence that, taking into account all of the evidence—both the evidence adduced at the original criminal trial and the evidence adduced at the habeas corpus trial—he is actually innocent of the crime of which he stands convicted.[9] Second, the petitioner must

---

[9] "The burden of proof under the clear and convincing evidence standard is sustained if the evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." (Internal quotation marks omitted.) *Correia* v. *Rowland*, 263 Conn. 453, 475 n.22, 820 A.2d 1009 (2003).

also establish that, after considering all of that evidence and the inferences drawn therefrom as the habeas court did, no reasonable fact finder would find the petitioner guilty of the crime." (Internal quotation marks omitted.) *Correia* v. *Rowland*, 263 Conn. 453, 475, 820 A.2d 1009 (2003).[10]

The petitioner's claim that the second habeas court failed to consider all of the evidence is speculative. There is no evidence in the record, despite some initial confusion about the exhibits, to establish that the habeas court never reviewed the December 13, 2001 transcript, which contained Tucker's recanted testimony. Moreover, the evidence presented fails to demonstrate that the petitioner is actually innocent of the crimes of which he stands convicted. At best, the totality of Tucker's habeas testimony is contradictory and inconclusive on the question of whether the petitioner was present at the shooting. The purpose of presenting Tucker's testimony at the habeas trial was to give Tucker the opportunity to recant his earlier identification of the petitioner as one of the shooters. To this effect, Tucker testified that, on the night in question, he did not see the petitioner get out of the Jeep, did not see the petitioner on the street and did not see the petitioner either before or after the shooting. Prior to this testimony, however, when asked whether he was

---

[10] In *Clarke* v. *Commissioner of Correction*, 249 Conn. 350, 358, 732 A.2d 754 (1999), we stated that whether a claim of actual innocence must be based on newly discovered evidence is still an open question in our habeas jurisprudence. In the present case, both parties and the habeas court acknowledge, explicitly and implicitly, that our appellate courts do require a claim of actual innocence to be based on newly discovered evidence. See *Johnson* v. *Commissioner of Correction*, 101 Conn. App. 465, 470–71, 922 A.2d 221 (2007). Because the respondent does not challenge the petitioner's claim on those grounds and the habeas court proceeded as if the evidence was newly discovered, we are not called upon to resolve this question. See *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 789 n.29 (assuming, without deciding, that actual innocence claim must be based on new evidence).

able to see the faces of the individuals who got out of the Jeep, Tucker responded, "No." This assertion severely undermines the thrust of Tucker's testimony and does nothing to call into question the other evidence presented against the petitioner at his criminal trial, including the identification of the petitioner by another eyewitness, Stacy Bethea, or the testimony of Douglas, concerning inculpating statements allegedly made by the petitioner and Douglas after the shooting regarding who had fired the fatal shots. Finally, for the same reasons outlined in part III of this opinion, we conclude that the "exculpatory" testimony of Henderson and Sanders is insufficient to establish the petitioner's innocence by clear and convincing evidence.

V

The petitioner's final claim on appeal is that delays that have drawn out the proceedings on his habeas petitions for a period of nearly ten years[11] have denied him due process of law under the fifth and fourteenth amendments to the United States constitution and article first, §§ 8, 10 and 12, of the Connecticut constitution, access to the courts and the right to petition for a writ

---

[11] The petitioner filed his initial petition for a writ of habeas corpus on April 18, 1997. The petitioner's initial special public defender moved to withdraw as counsel on January 25, 1999, due to a personal conflict of interest. On January 14, 2000, the petitioner's replacement counsel also moved to withdraw due to her assignment to the public defender's office, which apparently had a conflict of interest with the petitioner. The initial habeas trial commenced on October 10, 2001. The habeas court received the testimony of various witnesses over the course of six nonconsecutive days, which lasted through April 3, 2002. On September 17, 2002, the first habeas court declared a mistrial. Following the mistrial, the petitioner's third counsel moved to withdraw as counsel, and the motion was granted on September 19, 2003. The petitioner's fourth habeas counsel, Salvatore Adamo, was appointed on November 5, 2003. Attorney Adamo filed an amended petition on April 13, 2005. The petitioner's second habeas trial commenced on September 12, 2006, whereupon the second habeas court received the testimony of the remaining two witnesses. On January 24, 2007, the habeas court rendered judgment for the respondent.

of habeas corpus. Because the petitioner did not raise this claim at trial, he seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40.

We decline to review the petitioner's claim under *Golding* because the record largely is devoid of reasons explaining the nearly ten year delay in a manner appropriate to afford appellate review. For example, we do not know why there was a nearly three year gap between the declaration of a mistrial in the first habeas proceeding and the commencement of the petitioner's second habeas trial. The record reveals only that, during those three years, the petitioner's third counsel withdrew shortly after the mistrial and that the petitioner's fourth counsel filed an amended petition. Because neither the petitioner nor any of the petitioner's attorneys testified with respect to the reason for any delays, we also do not know whether part of that passage of time, for example, had been the result of a strategic decision to attempt to discover more exculpatory evidence, an oversight on the part of the petitioner's counsel, a refusal to cooperate on the part of the petitioner or any other potential reasons for which trials are delayed. While a ten year delay is troubling on the face of the matter, the appropriate course of action would have been to raise the claim in the habeas court. In view of the inadequate record, we decline to afford *Golding* review.[12]

The judgment is affirmed.

In this opinion the other justices concurred.

---

[12] Even if the record was adequate to reach the merits of the petitioner's claim, the fact that the petitioner did not raise the claim until after the second habeas court rendered judgment for the respondent weighs heavily against the petitioner. "The [petitioner's] assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether the [petitioner] is being deprived of the right." *Barker* v. *Wingo*, 407 U.S. 514, 531–32, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972). That the petitioner has attempted to hedge his bet by withholding his undue delay claim until after the second habeas court had rendered judgment against him speaks volumes about whether his rights were, in fact, denied.