******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* LUIS ORTIZ
(AC 35513)

Lavine, Keller and Prescott, Js.

*Argued October 21—officially released December 23, 2014*

(Appeal from Superior Court, judicial district of
Hartford, Vitale, J.)

*Jodi Zils Gagne*, assigned counsel, for the appellant (defendant).

*Brett R. Aiello*, special deputy assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *David L. Zagaja*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Luis Ortiz, appeals from the judgment of conviction, rendered following a jury trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (5), conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-48 and 53a-59 (a) (5), and carrying a pistol without a permit in violation of General Statutes § 29-35.[1] The defendant claims that the court improperly denied (1) his motions to suppress evidence and (2) his motion for a judgment of acquittal. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found that, on April 9, 2011, the victim, Raphael Alsina, was walking with his girlfriend, Rosa Arroyo, on Maple Street in Hartford. The defendant and his brother-in-law, Heriberto Pagan, were driving on Maple Street when they approached the victim and Arroyo. A verbal argument between the three men ensued. Prior to these events, the defendant and the victim had an acrimonious history and, weeks earlier, the victim's brother sustained physical injury during an altercation with Pagan. After this initial encounter on Maple Street, the defendant and Pagan drove to Pagan's residence, where Pagan retrieved a gun. Pagan and the defendant drove back to the victim's location on Maple Street. Pagan, who was in the driver's seat of the automobile, pointed the gun at the victim, and stated: "We're either going to finish this or I'm going to kill you." The victim approached the automobile, at which time the defendant exited the passenger side of the automobile while brandishing the gun that Pagan had been holding moments earlier, and shot the victim in the chest. The defendant did not have a permit to possess the gun lawfully. The victim sustained serious injuries, but survived the shooting. Thereafter, the defendant and Pagan fled the scene.

Following the defendant's arrest, he was convicted of assault in the first degree, conspiracy to commit assault in the first degree, and carrying a pistol without a permit. This appeal followed. Additional facts and procedural history will be set forth in the context of the defendant's claims.

I

First, the defendant claims that the court improperly denied his motions to suppress evidence related to eyewitness identifications and a self-incriminatory statement that he provided to the police following his arrest. We disagree with the claim, and will address both aspects of it in turn.

A

Eyewitness Identification Evidence

By means of a written motion to suppress evidence

filed August 1, 2012, the defendant moved to suppress any evidence of pretrial or in-court identifications of him on the grounds that (1) "[t]he identification procedure employed was unnecessarily suggestive," (2) "[a]n in-court identification would be irretrievably tainted by the prior illegal identification and would thus lack an independent basis," and (3) "[a]ny identification offered would fail to meet the standard of reliability as enunciated in *Neil* v. *Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972)." The court held an evidentiary hearing on the motion, during which it heard evidence related to eyewitness identifications of the defendant that were made by Arroyo and Raphael Noguet, a bystander who witnessed the events at the scene of the shooting.

At the suppression hearing, the court heard testimony from Mark Fowler, Mark Rostkowski, and Jose Perez, all of whom are detectives with the Hartford Police Department. The court also heard testimony from Pagan, Arroyo, and Noguet. Relevant to the present claim, Fowler testified with regard to the procedure by which Arroyo identified the defendant, as the shooter, and Pagan, as the driver of the automobile used during the shooting, by means of two photographic arrays. Rostkowski testified with regard to the procedure by which Noguet identified the defendant, as the shooter, by means of a photographic array.

After the presentation of evidence at the suppression hearing, the defendant's attorney argued, for a variety of reasons unrelated to the manner in which the photographic arrays were administered by the police, that the identifications of the defendant made by Arroyo and Noguet were not reliable. Thereafter, the following colloquy occurred:

"The Court: All right. In terms of the actual procedures themselves on the photo boards . . . what is the claim in terms of why they are unnecessarily suggestive? *I mean, are you making any specific claims regarding the procedure, the pictures, anything like that?*

"[Defense Counsel]: Judge, on their [face], the procedures, and on the testimony, if the court chooses to credit it, that's what they're supposed to do. *I don't have . . . any criticism that I can offer the court based on the testimony and the evidence that's been presented to you.*

"The Court: Well, I mean, if that's the case, then do we even get to the reliability portion of this? If you're essentially telling me that the procedures are not unnecessarily suggestive, we don't get to the second prong unless there's a problem with the first prong.

"[Defense Counsel]: Judge, I think I would take the position that, particularly with Ms. Arroyo, that perhaps standard analysis does not cover the problem. And

whether or not the police procedure was fair, if the source of her identification is not coming from her direct observation, then arguably she's not a confident witness to testify on that point, and then by extension, you know, the evidence that's been created, so to speak, by . . . the identification procedure is not reliable, either. It's apart from the normal analysis." (Emphasis added.)

Following the suppression hearing, the court, in an oral decision, denied the motion to suppress. The court made detailed findings of fact concerning the positive identifications made by Arroyo and Noguet by means of the photographic arrays. The court stated that it had reviewed the evidence and had evaluated the claim pursuant to the analytical framework set forth in *State v. Marquez*, 291 Conn. 122, 141–43, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009). There is no dispute, and we agree, that *Marquez* sets forth the applicable framework for this type of claim.

In *Marquez*, our Supreme Court stated: "In determining whether identification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the totality of the circumstances. . . .

"There are . . . two factors that courts have considered in analyzing photographic identification procedures for improper suggestiveness. The first factor concerns the composition of the photographic array itself. In this regard, courts have analyzed whether the photographs used were selected or displayed in such a manner as to emphasize or highlight the individual whom the police believe is the suspect. . . .

"The second factor, which is related to the first but [is] conceptually broader, requires the court to examine the actions of law enforcement personnel to determine whether the witness' attention was directed to a suspect because of police conduct. . . . In considering this [factor, the court should] look to the effects of the circumstances of the pretrial identification, not whether law enforcement officers intended to prejudice the defendant." (Citations omitted; internal quotation marks omitted.) Id.

First, the court addressed Noguet's identification. With regard to the first factor relevant to a claim of improper suggestiveness, the court stated: "The court did inquire [during the hearing on the motion to suppress] and was not alerted to any claim by the defendant as to whether the photographs used in the photo board with regard to [Noguet] were selected or displayed in

such a manner as to emphasize or highlight the individual police thought was the suspect. Defense essentially did concede that there was no claim like that being made. The court has evaluated the testimony of the witness and Detective Rostkowski. The court finds there is nothing in the composition of the photo board nor in the conduct of the police that is unnecessarily suggestive." With regard to the second factor, the court concluded that there was no evidence that the circumstances of the pretrial investigation influenced Noguet's identification.

Next, the court addressed Arroyo's identification of the defendant. With regard to the first factor relevant to a claim of improper suggestiveness, the court made detailed findings concerning Arroyo's testimony and the manner in which the police administered the photographic arrays at issue. The court stated, in relevant part: "Again, the defendant appears to concede nothing in the lineup itself or the procedure was suggestive." The court went on to find that nothing in Arroyo's testimony indicated that, at the time of the shooting, she was not in a position to observe the defendant.

Having concluded that the procedures at issue were not unnecessarily suggestive, the court stated that it need not consider whether the identifications were nevertheless reliable based on an examination of the totality of the circumstances. Accordingly, the court denied the motion to suppress.

Before this court, the defendant analyzes his claim by asserting that the identification procedures used by the police were unnecessarily suggestive because the police failed to employ a double-blind,[2] sequential[3] procedure of administering the photographic arrays to Arroyo and Noguet. The defendant supports his analysis with reference to various written publications, none of which were mentioned during argument on the defendant's motion to suppress or presented to the trial court for its consideration. The defendant urges this court to conclude that the identifications were unnecessarily suggestive on this specific ground and, thereafter, to conclude that the identifications were unreliable.

We agree with the state that the claim is unpreserved and that it does not warrant appellate review on its merits. The defendant brought a motion to suppress in which he challenged in broad terms the suggestiveness of the identification procedure at issue in this case. The court held a hearing on the motion, during which the court was presented with a full factual record of what had occurred during the identification process. With the benefit of this factual record, however, the defendant's attorney did not argue that the identification procedure was deficient in any way, let alone raise the specific claim articulated here. Rather, as discussed earlier in this opinion, the defendant's attorney stated that, on the basis of his evaluation of the evidence before the

court, he did not have "any criticism" of the photographic array procedure at issue. In its decision, the court explicitly relied on the representations of the defendant's attorney.

The defendant asserts: "The motion was made, the hearing was held, and the claim was preserved." Moreover, the defendant argues that it is of no consequence that his trial counsel did not raise the claim presented here or that he did not argue that the identification procedure was deficient in any way. The defendant argues that this is because, in contrast to trial counsel, who "had a difficult time articulating these arguments at the suppression hearing," appellate counsel had the benefit of "more time to research these issues and elaborate on them . . . ." Taken to its logical end, the defendant's argument is that because he filed a motion to suppress, such motion encompassed any conceivable argument related to the evidence at issue.

The defendant's arguments are at odds with well settled principle that, generally, claims of error will not be considered on their merits at the appellate level unless they were distinctly raised before and addressed by the trial court. "Only in most exceptional circumstances can and will this court consider a claim, constitutional or otherwise, that has not been raised and decided in the trial court." *State* v. *Evans*, 165 Conn. 61, 69, 327 A.2d 576 (1973); see also Practice Book § 60-5 ("[t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial"). This principle is based on principles of fairness, both to the trial court and opposing counsel, and judicial economy.

Beyond the fact that the present claim was not raised before the trial court remains the fact that the court did not address a claim related to the suggestibility of the identification procedures used by the police because, at the suppression hearing, the defendant's attorney expressly waived such a claim. As the colloquy excerpted previously reflects, following a pertinent inquiry by the court, the defendant's attorney unambiguously stated that the defense did not have any criticism of the identification procedures. The court was entitled, and could be expected, to rely on the representations of the defendant's attorney when evaluating what issues properly were before it.[4] "We generally do not review unpreserved, waived claims. . . . To reach a contrary conclusion would result in an ambush of the trial court by permitting the defendant to raise a claim on appeal that his or her counsel expressly had abandoned in the trial court." (Citation omitted; internal quotation marks omitted.) *State* v. *Foster*, 293 Conn. 327, 337, 977 A.2d 199 (2009). On the basis of the foregoing, we do not review the defendant's claim.

B

### Defendant's Statement to Police

By means of a written motion to suppress evidence filed August 1, 2012, the defendant asked the court to suppress "all statements, whether written or oral, allegedly made by [him], items seized as a result and any testimony related thereto." The defendant asserted in his motion that such statements were (1) obtained in violation of his right against self-incrimination, (2) made without the assistance of counsel, and (3) made in the absence of a knowing and intelligent waiver of the right to counsel.

During the suppression hearing discussed in part I A of this opinion, at which evidence was presented with regard to both motions to suppress brought by the defense, the court heard evidence concerning a written statement that the defendant provided to the police following his arrest.[5] This statement is the subject of the present claim. During argument on the motion, one of the arguments advanced by the defendant's attorney was that the defendant's statement should be suppressed because Spanish is the defendant's first language and, even though the police advised him of his *Miranda* rights[6] in Spanish, he was interrogated in English and the typed statement prepared by the police and signed by the defendant was in English. The defendant's attorney was not particularly clear in advancing the legal basis underlying his argument, but stated that the procedure employed by the police made the statement "less than reliable."

In its decision, the court found the following relevant facts: "Prior to talking to the defendant, he was advised of his so-called *Miranda* rights from a Hartford Police Department rights card. The defendant spoke and understood English, but he preferred that the rights be read to him in Spanish.[7] Rostkowski did not initially have a Spanish version of the so-called *Miranda* rights; however, Detective Jose Perez, a bilingual officer, read the defendant his constitutional rights from a Hartford Police Department *Miranda* rights card . . . . The rights card is in Spanish. Thereafter . . . a *Miranda* rights waiver form was read in Spanish by Detective Perez, which the defendant both signed and initialed . . . .

"Both advisements and the waiver were . . . witnessed by Detective Rostkowski and Perez . . . . The rights forms in Spanish were read in Spanish to the defendant by Detective Perez. Detective Perez represented to Detective Rostkowski that the defendant understood his rights and wished to speak with the police. The defendant also said he could communicate in English and did not express any hesitation in doing so to Detective Rostkowski.

"His statement was taken by means of Rostkowski's interviewing the defendant and simultaneously typing

the defendant's statement on a laptop computer. The defendant had the opportunity to review the statement, it was read back to him, and each sentence was gone over. The defendant was asked if he was in agreement with the contents and did indicate he was in agreement. The defendant demonstrated his agreement by signing both pages of the statement . . . .

"He was emotional and somber during the taking of the statement and was provided with the opportunity to use the bathroom and provided with a drink. He did not appear to be under the influence of any intoxicants. The defendant was forthcoming and was allowed to elaborate, and the conversation followed a natural progression. The state concedes that the defendant was subject to custodial interrogation.

"In addition, there does not appear to be a serious dispute that the police provided the defendant with his *Miranda* warnings. The defendant claims that a knowing, intelligent waiver of his fifth amendment rights did not occur as a consequence of his having been advised of his rights in Spanish and his statement thereafter being taken in English."

The court set forth relevant legal principles related to whether the defendant knowingly and intelligently waived his rights under *Miranda*. The court made the following additional findings: "First, with respect to his intelligence, it did not appear to either Detective Rostkowski or Detective Perez that the defendant had any difficulty understanding or speaking the English language nor the Spanish language, and the defendant indicated to Perez that he wished to speak to the police.

"In terms of his age, he is an adult.

"With regard to his level of education . . . no evidence at the hearing was presented that the defendant lacked [an] education which impaired his ability to understand and therefore knowingly and intelligently waive his rights.

"With regard to his general physical, mental and emotional state, there is evidence that the defendant was somber and occasionally emotional; however, the evidence demonstrates that the defendant was in full possession of his faculties at the time of the statement."

The court went on to determine that the defendant waived his *Miranda* rights of his own, "free, considered and unrestrained choice." The court stated: "There is no evidence that the police used threats or any other coercive tactic to elicit the waiver. There was no indication that the defendant's free will was overcome, nor that the statement was not freely self-determined. There is nothing in the record from which the court can conclude that the defendant did not act voluntarily, knowingly and intelligently when he waived his rights. There is no evidence in the record indicating a lack of understanding by the defendant of what he was doing or the

legal consequences of . . . his actions. At no time did the defendant ask for a clarification or explanation of what was occurring."

Addressing the defendant's claim that the court should suppress the statement because it was typed in English, the court, after referring to several legal authorities, stated: "[The] court finds that the defendant's statement . . . has been properly authenticated. The defendant himself, prior to the start of the hearing, indicated that he spoke both Spanish and English and that he understood English. The court finds that there is nothing in the record to support the claim that the procedure at issue, advisement in Spanish and statement in English, resulted in a statement that was involuntary nor that it was the product of an invalid waiver of his *Miranda* rights. The court finds the defendant request[ed] . . . the advisement be explained in Spanish, which was his native language, but that there is no evidence to support a claim that the subsequent statement provided in English was not freely self-determined or not reliable."

Echoing one of the arguments that he advanced before the trial court, the defendant claims on appeal that his statement should have been suppressed because he was advised of his *Miranda* rights in Spanish, but his typed statement, that he signed, was in English. His claim does not pertain to his *Miranda* rights waiver, but his understanding of the content of the statement that he signed, in which he incriminated himself in the shooting. In his principal brief, he argues that he had a "limited working knowledge of the English language and possibly did not fully understand all of the words he was hearing." The defendant suggests that there was a danger in these circumstances that "the police could have added facts to his statement that he did not say."

"[O]ur standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the court's [ruling] . . . ." (Internal quotation marks omitted.) *State* v. *Ocasio*, 112 Conn. App. 737, 742–43, 963 A.2d 1109, cert. denied, 292 Conn. 904, 973 A.2d 106 (2009).

The defendant correctly concedes that there is no legal authority that forbids the type of procedure employed by the police in the present case. His legal argument that the statement should have been suppressed on the ground of lack of voluntariness hinges on the accuracy of his factual assertion that he lacked

a sufficient understanding of the English language to comprehend the words spoken to him by the police in that language. The defendant, however, fails in any manner to challenge the correctness of the court's factual findings that at the time that he provided the statement to the police, he was capable of communicating in English and, although he had requested that his *Miranda* advisement occur in Spanish, he was not hesitant thereafter to communicate with the police in English. The court based this critical factual finding not merely on its own observations of the defendant at the time of the suppression hearing, but on the totality of its circumstantial findings of what transpired during the police interrogation, including the defendant's own statements to the police as well as the observations of the defendant made by the police officers involved in his interrogation. The defendant has not challenged the court's findings in this regard. Moreover, the court found that Rostkowski read each sentence of the typewritten statement to the defendant, who indicated that he agreed with its contents. This finding, unchallenged on appeal and based on the evidence, undermines any claim of police wrongdoing with regard to the content of the statement that the defendant signed. Our careful review of the evidence fully supports the court's finding that the defendant understood the English language and that the defendant understood the content of his statement when Rostkowski read it to him. Accordingly, we reject the defendant's claim that the court improperly denied his motion to suppress his statement.

## II

Next, the defendant claims that the court improperly denied his motion for a judgment of acquittal because the evidence was insufficient to sustain a conviction with regard to any of the crimes with which he was charged. The record reflects that he moved for a judgment of acquittal with regard to all counts at the conclusion of the state's case-in-chief. The court denied the motion.

The defendant's analysis of this claim is wholly dependent on a determination by this court that the court improperly denied his motion to suppress the eyewitness identification evidence (discussed in part I A of this opinion), and the defendant's statement to the police following his arrest (discussed in part I B of this opinion). The defendant's claim is that "[w]ithout the identifications [of the defendant by Arroyo and Noguet] and the statement, all of which should have been suppressed, there was insufficient evidence to convict [him]. Without the identifications and the statement, the state failed to prove [his] guilt beyond a reasonable doubt." Because we conclude in part I of this opinion that the court properly denied the defendant's motions to suppress, the defendant is unable to prevail with regard to this claim.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The court sentenced the defendant to a total effective term of incarceration of twenty years, suspended after fifteen years, one year of which was a mandatory minimum sentence, followed by a term of probation of five years.

[2] A double-blind photographic array is "administered by an uninterested party without knowledge of which photograph represents the suspect." *State* v. *Marquez*, supra, 291 Conn. 132.

[3] "A simultaneous photographic array is one in which the witness is shown a photograph board containing six or eight photographs, only one of which is of the suspect. This is in contrast to a sequential photographic array, in which the witness is shown the photographs one at a time. See *State* v. *Williams*, 146 Conn. App. 114, 129 n.16, 75 A.3d 668, cert. granted on other grounds, 310 Conn. 959, 82 A.3d 626 (2013)." *State* v. *Wright*, 152 Conn. App. 260, 280 n.12, 96 A.3d 638 (2014).

[4] The defendant does not request any extraordinary level of review of this claim and affirmatively states that he does not seek review under the doctrine set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Nonetheless, we observe that, even if the defendant had sought review under *Golding* or had argued that the judgment should be reversed on the basis of plain error, waiver thwarts review under both *Golding* and the plain error doctrine. See, e.g., *Mozell* v. *Commissioner of Correction*, 291 Conn. 62, 70, 967 A.2d 41 (2009).

[5] In the signed and sworn statement, the defendant averred, inter alia, that there was an ongoing dispute between him and the victim, and that the shooting occurred accidentally during a physical altercation between himself and the victim. The defendant admitting getting out of Pagan's automobile with a gun, at which time the victim ran into him, which caused the gun to discharge. The defendant expressed remorse for the shooting.

[6] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[7] The defendant communicated this preference in English.